**STATE of Missouri, Plaintiff/Respondent,**

v.

**Charles HUCHTING,**
**Defendant/Appellant.**

**Charles HUCHTING, Movant,**

v.

**STATE of Missouri, Respondent.**

Nos. 65861, 68410.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 11, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 24, 1996.

Application to Transfer Denied
Sept. 17, 1996.

Wittner, Poger, Rosenblum & Spewak, P.C., N. Scott Rosenblum. Ramona L. Marten, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

PUDLOWSKI, Judge.

Defendant Charles Huchting appeals from his conviction in the Circuit Court of the City of St. Louis for forcible rape, forcible sodomy and felony stealing. He was sentenced to consecutive sentences of thirty years for the first two counts, and a seven-year consecutive sentence for the third count.

■ This is a consolidated appeal of defendant's direct appeal and his Rule 29.15 motion. We need not consider the 29.15 motion because it has not been briefed. "Allegations of error that are not briefed or are not properly briefed on appeal shall not be considered by this court except errors respecting the sufficiency of the information or indictment, verdict, judgment, or sentences." *State v. Williams*, 904 S.W.2d 103, 106 (Mo. App. E.D.1995).

The relevant facts of the direct appeal reveal that at 6:50 a.m. on January 22, 1993, victim was attacked in the garage of her apartment as she was preparing to go to work. She testified that defendant approached her from behind and grabbed her while placing a gloved hand over her mouth. The glove smelled like gasoline.

She testified that defendant first pulled her purse off her shoulder, then pushed her to the floor of the garage and struggled with her in removing her clothing. After striking her and pulling her hair, victim related that defendant removed her pantyhose and underwear, then pulled her raincoat over her head and instructed her not to look at him. However, victim disclosed that the raincoat came off her head at several different points in time and she saw the defendant.

Victim testified that after unsuccessfully trying to penetrate her vagina with his penis, defendant felt her breasts and forced his penis in her mouth. He then penetrated her vagina with his penis. Victim testified that she struggled and screamed throughout the attack, despite her attacker's threats to inflict further harm if she was not quiet. Victim testified that she was finally able to push herself away from the defendant and escape out the door of the garage. He ran out the back of the garage.

The victim's neighbor was in her apartment with her husband that morning when she heard a scream and looked out the window. She observed a man in dark clothes running through the backyard and between apartment buildings. She sent her husband to chase after the man. Even though he did not actually see the person, he saw a man in dark clothing and blond hair getting into an automobile. Husband then recorded the license plate number and gave the information to the police.

Police officer William Murphy, who originally went to defendant's apartment to find him, testified that he smelled a "heavy smell" of petroleum in the apartment. Lyndon Harr, defendant's employer, testified that at 8:00 a.m. on the day of the assault, defendant clocked into work at his job laying asphalt. Harr testified that his workers used diesel fuel to keep the tools from sticking to each other.

Victim viewed a police line-up and identified defendant as her attacker.

At trial, a criminologist for the state, Donna Becherer, explained the results of the state's DNA evidence linking defendant to the crime. Becherer testified that defendant's DNA matched that of semen samples taken from the victim's underwear and the floor of the garage. The state also introduced evidence linking fibers found in victim's hair to gray acrylic gloves of the type belonging to defendant.

Using the statistical methods customarily employed by her laboratory, Becherer testified that the odds of another person having defendant's DNA structure were one in twenty thousand. Later in the trial, Becherer opined that using the FBI's statistical methods, the odds of a match were one in two and a half million.

In his first point on appeal, defendant contends that the trial court erred by denying

his motion to suppress an out-of-court identification because the line-up procedure in which the victim identified him as her attacker was impermissibly suggestive.

■ Although defendant made a pre-trial motion to suppress identification, he failed to object to the victim's in-court identification. Pre-trial motions to suppress evidence alone are insufficient to preserve evidentiary objections for appeal. "The rule is well established in Missouri that when a motion to suppress evidence is denied and the evidence is subsequently offered at trial, defendant must object at trial to the admission of the evidence." *State v. Fields*, 636 S.W.2d 76, 79 (Mo.App. E.D.1982).

■ Defendant claims that the trial court's statement that it would take the motion "with the case" and rule upon it at "the appropriate time" led him to believe that his objection to the identification was continuing, and that further objections during trial were unnecessary. Defendant's reasoning is faulty. Introduction of the victim's identification at trial should have provided defendant sufficient notice that his pre-trial motion was unsuccessful, and that an objection during trial was, therefore, necessary to preserve the issue for appeal.

■ Because defendant failed to preserve this point for review, this court will not review the trial court's decision for abuse of discretion. This court does, however, have the discretion to review for plain error. *State v. McGuire*, 892 S.W.2d 381, 385 (Mo. App. E.D.1995). To show that the trial court committed plain error, "[a] defendant must not only show that prejudicial error resulted, but he must further show that the error so substantially affects his rights that manifest injustice or a miscarriage of justice will inexorably result if left uncorrected." *Id.*

■ Missouri employs a two-prong analysis for determining whether identification testimony should be admitted: (1) was the pre-trial identification procedure suggestive; and (2) if so, did the suggestive procedure affect the reliability of the identification made by the witnesses. *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc 1989). Identification evidence is admissible unless the procedures lead to a "substantial likelihood of irreparable misidentification." *Id.*

■ Defendant contends that the line-up procedure leading to the pre-trial identification was unduly suggestive because Officer Dunn said "okay" to the victim as defendant was asked to step out of the line-up toward the one-way glass, and because none of the three other men in the line-up matched the victim's description of her attacker's height, weight, color of facial hair, or clothing. We find neither of these circumstances sufficiently suggestive to have created a substantial likelihood of irreparable misidentification on the part of the victim.

The nature and timing of Dunn's comments to the victim during the line-up procedure are not entirely clear from the record. In characterizing Dunn's comment as coinciding solely at the time defendant stepped forward from the line-up, he relies on the testimony of a public defender who witnessed the line-up procedure. However, Dunn testified that he had made reassuring comments to the victim throughout the line-up procedure. Sorting out conflicting testimony is a matter for the jury. Defendant may not assume the superior credibility of a favored witness in order to advance a point on appeal.

■ With regard to the appearance of the other men in the line-up, defendant wrongly asserts that the officers putting together a line-up have a duty to search for participants who look like the accused. Rather, all that is required is that a reasonable effort be made to find "physically similar participants." *State v. Cooper*, 708 S.W.2d 299, 305 (Mo. App. E.D.1986). A lineup is not impermissibly suggestive because the age, weight, height, hairstyle and other physical characteristics of the line-up participants are not exactly the same. *Id.* Also, the Missouri Supreme Court has recently affirmed that "[l]ineups have been held not to be impermissibly suggestive merely because of the color or characteristics of the clothing of persons in the lineup." *State v. Weaver*, 912 S.W.2d 499, 520 (Mo. banc 1995).

■ Even if the line-up was impermissibly suggestive, defendant has no grounds on

which to question the reliability of the victim's identification. Reliability is determined by examining the totality of the circumstances. *Hornbuckle,* 769 S.W.2d at 93. Courts are to consider: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

Defendant contends that the three seconds in which the victim viewed her attacker's face was an insufficient amount of time for her to have been able to make a reliable identification. He also asserts that the reliability of the victim's identification was compromised because the degree of her attention towards her attacker was low owing to her preoccupation with escape. He further points to inconsistencies between the victim's account of her attacker's appearance and the corresponding characteristics of him as evidence that the victim's description was inaccurate. Finally, defendant asserts that the victim's level of certainty regarding her line-up choice was low. (Defendant concedes the fifth reliability factor because the identification occurred only about seven hours after the attack).

■ Defendant is in error in assuming that three seconds was an insufficient amount of time upon which to base an identification of an assailant. Moreover, contrary to his assertions, the fact that the victim's observations occurred during a rape heightens the reliability of the victim's identification.

In *State v. Purnell,* 621 S.W.2d 277, 286 (Mo.1981), a rape victim viewed her attacker's face only once at the onset of the assault. Her identification was based on this single glimpse and a "couple of sneak looks" during the rape. *Id.* Nevertheless, the court found "[t]he mere fact that the period of time during which the prosecutrix viewed her assailant may have been short does not mean it was insufficient for her to base her identification." *Id.* In addition, the victim's opportunity to observe her attacker was further enhanced by the nature of the crime. As the

Missouri Supreme Court stated in *Grant v. State,* 446 S.W.2d 620, 621 (Mo.1969), "Virtually no other crime offers the opportunity for observation of the perpetrator as the crime of rape."

■ Defendant also claims the victim's identification is unreliable because it does not accurately describe him. As evidence of the victim's inaccuracy, he points to the fact that the victim could not remember whether she had described to police a hole in her attacker's jeans, which she later claimed to have seen. Also, the victim described her attacker as five foot seven inches in height, although he is actually six foot one inch tall. The victim described his coat and boot colors as brown when they were black. And the victim told police about her attacker's "funny eyes," but did not mention this feature to the hospital workers.

It does not follow from these "discrepancies" that the victim's testimony was unreliable. To be reliable, a victim's recollection of her attacker need not be picture-perfect. The court in *Heffner* held that although a robbery victim neglected to mention a suspect's tattoos when describing the robber to the police, "the mere fact that the clerk's description failed to include all details about defendant ... [did] not lead to the conclusion that [his] description was inaccurate." *State v. Heffner,* 641 S.W.2d 803, 806 (Mo.App. W.D.1982).

Neither do the clothing color and height disparities between the victim's description and the defendant render the victim's identification unreliable. "Such inconsistency is a matter for the jury to consider and resolve." *State v. Williams,* 566 S.W.2d 841, 845 (Mo. App.1978) (regarding victim's description of defendant's tweed coat as polka dot). "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature. The defect, if there be one, goes to weight and not to substance [of the identification]." *State v. Weaver,* 912 S.W.2d 499, 521 (Mo. banc 1995).

Finally, defendant claims that the victim's level of certainty in making her identification was not high and thus, the reliability of her

identification is damaged. Once again, the matter is one of conflicting facts. Defendant cites Officer Koviak as testifying the victim stated during the line-up she could not totally recognize her attacker. However, the victim clearly testified that she was "one hundred percent sure" that she had selected her attacker from the line-up. He claims the fact that the victim took 30 minutes to identify him as her attacker in the line-up indicates a lack of certainty on her part. However, the victim claimed she hesitated because she wanted to be "one-hundred and fifty percent sure" before identifying her attacker. It is the role of the jury to interpret these conflicting statements. Existence in the record of conflicting testimony does not make the victim's testimony unreliable.

Under the circumstances and in view of the plentitude of alternative evidence against defendant, we find neither prejudicial error, nor manifest injustice or miscarriage of justice, that would warrant reversal under plain error review. Point one denied.

In his second point on appeal, defendant states the trial court erred when it denied his motion for a *Frye* hearing to determine the admissibility of the state's DNA evidence because he was consequently denied his right to challenge the scientific reliability of the DNA evidence, and because the tests used to derive the evidence were in fact unreliable.

■ In *State v. Ralph Davis*, 814 S.W.2d 593 (Mo. banc 1991), the Missouri Supreme Court set out the rule with respect to the admissibility of DNA evidence. Evidence from scientific procedures is admissible in Missouri if the procedure is generally accepted by the scientific community in the "particular field in which it belongs." *Id.* at 600. The general scientific acceptability of DNA identification procedures is a matter of judicial notice in Missouri. *Id.* at 600–603; *State v. Daryl Davis*, 860 S.W.2d 369, 374 (Mo. App. E.D.1993).

Defendant's contentions are analogous to those of the defendants in both *Ralph Davis* and *Daryl Davis*. Defendant in *Ralph Davis* conceded the scientific acceptability of DNA typing. However, he challenged the admissibility of the state's DNA evidence on the ground the state had failed to demonstrate

the reliability of the procedures of the specific laboratory that performed the test. Specifically, the defendant cited the incompetence of the state's DNA expert witness to discuss tests he did not carry out, and the lack of basis for the statistics used to interpret the DNA test results. The court did not address the merits of this claim, explaining that "argument concerning the manner in which the tests were conducted goes more to the credibility of the witness and the weight of the evidence, which is in the first instance a discretionary call for the trial court, and ultimately for the jury." *Ralph Davis*, 814 S.W.2d at 603.

In *Daryl Davis*, the defendant challenged the admissibility of not only the DNA evidence itself, but the method of DNA testing used in his case. Despite the defendant's assertion that the trial court's reading of *Ralph Davis* was "overbroad," this court found that the trial court had not erred in refusing to grant defendant a *Frye* hearing. This court invoked the language from *Ralph Davis*, and explained that "the manner in which the DNA tests are 'conducted goes more to the credibility of the witness and the weight of the evidence....'" *Daryl Davis*, 860 S.W.2d at 374.

Like the defendants in both *Ralph Davis* and *Daryl Davis*, defendant asserts the general acceptability of DNA testing extends only to the theory behind DNA testing. He contends this court should reinterpret *Ralph Davis* as not applicable to such aspects of DNA testing as testing technique, laboratory conditions, or the statistics used to interpret test results. Rather, he believes that these aspects of DNA testing merit separate *Frye* hearings.

Defendant cites a series of cases from other jurisdictions in which DNA testing techniques, laboratory conditions, or interpretive statistics have been held to require a pre-trial hearing. *U.S. v. Two Bulls*, 918 F.2d 56 (8th Cir.1990); *Commonwealth v. Curnin*, 409 Mass. 218, 565 N.E.2d 440 (1991); *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992); *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992); *State v. Pennell*, 584 A.2d 513 (Del.1989); *People v.*

*Castro,* 144 Misc.2d 956, 545 N.Y.S.2d 985 (1989); *State v. Schwartz,* 447 N.W.2d 422 (Minn.1989); *State v. Cauthron,* 120 Wash.2d 879, 846 P.2d 502 (1993); *People v. Barney,* 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (1992). Defendant overlooks the Missouri Supreme Court consideration of four of these cases and deliberately chose not to follow them. *Ralph Davis,* 814 S.W.2d at 601–2 (examining *Two Bulls,* 918 F.2d 56; *Curnin,* 565 N.E.2d 440; *Castro,* 545 N.Y.S.2d 985; and *Schwartz,* 447 N.W.2d 422.) Moreover, the overwhelming majority of jurisdictions that have found that DNA evidence is generally acceptable in the scientific community have not permitted separate *Frye* hearings for DNA testing techniques, laboratory conditions or interpretive statistics. *See* 84 A.L.R.4th 313.

Defendant also contends the trial court erred in admitting the state's DNA evidence because the state failed to lay a proper foundation for the DNA test results. Specifically, he claims that the DNA evidence was unreliable because the laboratory in which the test was conducted used unaccredited procedures, unspecified protocols and St. Louis Police Department procedures and statistics, which, unlike the procedures and statistics of the commercial laboratory in *Ralph Davis,* have never been "reviewed or approved by a higher court." Moreover, Defendant insists that the Missouri Supreme Court's statement that "the reliability of the tests is first a discretionary matter to be determined by the court. . . ." *Ralph Davis,* 814 S.W.2d at 603, entitles him to a pretrial evidentiary hearing regarding the reliability of the tests themselves.

 Defendant fails to understand the admissibility of DNA evidence in trial courts of this state. "[E]xpert opinions based on scientific tests are admissible if the scientific principle involved is generally considered by the scientific community as reliable." *State v. Williams,* 659 S.W.2d 309 (Mo.App.1983). In *Ralph Davis,* the Missouri Supreme Court determined that DNA evidence is scientifically acceptable and is thereby admissible as evidence in trial courts. *Daryl Davis,* 860 S.W.2d at 374. As a result, the admissibility of expert testimony regarding various components of DNA evidence, like the admissibility of any expert testimony, "rests largely within the discretion of the trial court whose determination will not be disturbed on appeal unless an abuse is shown." *State v. Sager,* 600 S.W.2d 541, 572 (Mo.App.1980). Where a defendant has objected to "the manner in which the analysis was conducted" or to "the specific test results," such objection "goes to the weight and not the admissibility of the evidence." [1] *State v. Moore,* 690 S.W.2d 453, 456 (Mo.App. E.D.1985).[2]

 We do not find that the trial court abused its discretion in admitting the testimony of Donna Becherer, a criminologist and experienced DNA identification analyst, to testify with regard to the nature and significance of the DNA test. Defendant had ample opportunity during cross-examination to discredit the manner in which the DNA tests were conducted. Point denied.

---

1. *See* also, *State v. Endicott,* 732 S.W.2d 239, 242 (Mo.App.1987)(The questions raised by defendant regarding the tests' reliability did not prevent the admissibility of the results of the tests but went to the weight of that evidence, which was for the jury to determine.) *State v. Johnson,* 539 S.W.2d 493, 501 (Mo.App.1976)("Objections to the manner in which the analysis was conducted go to the weight rather than to the admissibility of the evidence"). *Id.* "Whether a witness is shown to be qualified or not as an expert is a preliminary question to be determined in the first place by the court; and the rule is, that if the court admits the testimony, then it is for the jury to decide whether any, and if any, what weight is to be given to the testimony." (quoting *Congress & Empire Spring Co. v. Edgar,* 99 U.S. 645, 657, 25 L.Ed. 487 (1878)).

2. There are cases in Missouri in which the state has been held to an affirmative duty to establish the accuracy and reliability of scientific evidence, and not simply demonstrate its acceptance by the scientific community. However, these cases involve statutorily-imposed evidentiary burdens. *See State v. Deimeke,* 500 S.W.2d 257, 258 (Mo. App.1973) (holding that evidence from a breathalyzer test was inadmissible owing to failure of the state to show that it had conducted the test properly); *State v. Young,* 525 S.W.2d 440, 441 (Mo.App.1975) (holding breathalyzer test results unreliable and hence inadmissible when the state's own evidence on the record showed the breathalyzer machine was non-functioning).

In his third point defendant contends that the trial court erred when it denied his Motion for Funds to Employ a Forensic Chemist because without state financial assistance to pay for the consultation of an expert witness, he was unable to defend himself in the face of scientific evidence beyond a layperson's grasp.

In rebuttal the state asserts first, defendant has not filed a concomitant affidavit of indigence to prove that he indeed lacked the funds to pay for an expert witness and second, at the time he requested state assistance, he was being represented by private counsel as opposed to the Public Defender's Office, therefore, the trial court did not err.

■ Whether a trial court has erred in refusing to grant funds for defendant to hire an expert witness for consultation when the defendant has failed to file an affidavit of indigence is a question of first impression in this state. However, we have addressed the issue of a defendant requesting an appointment of counsel without filing an affidavit of indigence. This court has clearly stated that "without the affidavit of indigence, we cannot hold the motion court erred in failing to appoint counsel for [a] Defendant. We will not require the motion court to guess about the [defendant's] financial conditions." *State v. Nichols,* 865 S.W.2d 435, 438 (Mo.App. E.D.1993). A defendant seeking court-appointed counsel is required by statute to file an affidavit of indigence. RSMo § 600.086.3 (1982). Clearly, as is the case with any public assistance program, some form of proof of absolute need must be proffered by a defendant before he may avail himself of such services. Therefore, we hold by analogy to court-appointed counsel procedures that an affidavit of indigence is a pre-requisite for requesting funds to employ an expert witness.

■ Even if we were to apply such a ruling prospectively and allow defendant's motion to stand, his point on appeal would still not survive review on the merits. However, before we address the merits, we will consider the defendant's question of whether the retention of private counsel precludes an accused from petitioning the trial court for state assistance to hire an expert witness. We decide that it does not.

Although no Missouri court has ruled directly on this issue, other jurisdictions in which no controlling statutes have been enacted have uniformly held that the retention of private counsel does not cause a defendant to forfeit his or her eligibility for state assistance in paying for expert witness or investigation expenses. *See,* et al., *In Re Cannady,* 126 N.J. 486, 600 A.2d 459 (1991); *English v. Missildine,* 311 N.W.2d 292 (Iowa 1981); *People v. Worthy,* 109 Cal.App.3d 514, 167 Cal.Rptr. 402 (1980); *Arnold v. Higa,* 61 Haw. 203, 600 P.2d 1383 (1979); *State v. Wilkes,* 193 W.Va. 206, 455 S.E.2d 575 (W.V. 1995). Many of those opinions point out that a defendant who spends down his resources in the middle of his defense or who relies on the largesse of friends and family for initial defense expenses is no less entitled to due process and fundamental fairness than is a defendant who enters the judicial system penniless. We believe such rule has merit. However such rule is not applicable to the facts of this case.

■ Reaching the merits of the issue, we are guided by our Missouri Supreme Court. It has observed that "in the absence of statutory authorization, the accused in a criminal case is not entitled to have his expert witnesses summoned at public expense." *State v. Young,* 701 S.W.2d 429, 433 (Mo. banc 1985). It has also said that whether to provide public funds to aid an accused in the preparation of his defense is within the discretion of the trial court. *State v. Holland,* 653 S.W.2d 670, 678 (Mo. banc 1983). We may interfere with the trial court's discretion only when there is a clear showing of abuse and a real possibility of injury to the complaining party. *Young* at 432. "Abuse" exists when "reasonable men could not differ as to the propriety of the action taken by the trial court." *Id.*

■ Defendant is unable to show that denial of the expert witness funding resulted in either abuse or prejudice. His argument rests on the premise that DNA evidence is so scientifically complex and technically specialized that it is beyond the ability of most attorneys to understand and adequately de-

fend against. His argument for state-funded expert witness assistance would be persuasive if this premise were valid. However, we disagree with his contention that the average attorney is ill-equipped to defend against this type of evidence. To the contrary, law libraries—i.e., law journals, practitioners' guides, annotated law reports, CLE materials, etc.—are teeming with information and advice for lawyers preparing to deal with DNA evidence in trial. Even a cursory perusal of the literature in this area reveals copious lists of questions for defense attorneys to use in cross-examinations and other strategies for undermining the weight of DNA evidence. Point denied.

In his fourth point on appeal, defendant contends the trial court erred when it overruled his objections to the introduction of statistical evidence interpreting the state's DNA tests because the evidence had not been disclosed by the state pursuant to the court's discovery order, and because the statistical evidence was itself unreliable.

Defendant first contends that his rights to a fair trial, due process, effective counsel and confrontation were compromised by the state's introduction of undisclosed "surprise" evidence mid-way through the trial. At one point in the trial, counsel for the state asked its expert DNA witness to refigure the probability estimate of finding an identical match to defendant's DNA sample by substituting the FBI's statistical database for the one developed by the St. Louis Police Department. The new figure revised the initial probability estimate of finding one identical match in twenty thousand to finding one in two and a half million.

■ It is true that the state's duty to disclose evidence in pretrial discovery continues beyond initial discovery. *State v. Royal*, 610 S.W.2d 946, 951 (Mo. banc 1981). However, it is unnecessary to decide whether the state in this case failed to comply with discovery rules. Even assuming a violation, defendant is unable to demonstrate that the late introduction of the new evidence resulted in fundamental unfairness to him.

■ Although the trial court may impose sanctions when the state violates discovery rules, "[a] finding of non-compliance ... does not end the inquiry. We must also determine whether or not the trial court abused its discretion in failing to impose a sanction." *Id.* The trial court abuses this discretion "only when the admittance of the evidence results in a fundamental unfairness to the defendant." *State v. Johnson*, 524 S.W.2d 97 (Mo. banc 1975); *State v. Couch*, 569 S.W.2d 789 (Mo.App.1978); *State v. Moten*, 542 S.W.2d 317 (Mo.App.1976). Evidence is fundamentally unfair when "the evidence or the discovery thereof would have affected the result of the trial." *State v. Couch, supra.*

■ The new DNA probability estimate was not fundamentally unfair to defendant. It is clear from the overwhelming evidence of his guilt that the new statistic or its discovery would not have affected the result of the trial.

■ Moreover, defendant's objection is suspect in light of the fact that he failed to seek a continuance from the trial court, despite having full and ample opportunity to do so. Failure to seek a continuance discredits a defendant's claims to have been prejudiced by new evidence submitted in violation of discovery rules. *State v. Royal*, 610 S.W.2d at 952–53.

■ The trial court also did not abuse its discretion in admitting the new probability estimate over the objection of defendant. He claims that FBI's "product rule" statistical method of determining the odds of a DNA match, which was the method used by Becherer to derive the second figure, is not scientifically acceptable and is, therefore, not reliable as a matter of law. We disagree. Once again, we find that the holding in *Ralph Davis* makes a separate *Frye* hearing unnecessary for each component of the DNA testing procedure. Defendants have the opportunity to discredit DNA evidence to the jury through the introduction of their own evidence or through cross examination of the state's expert witnesses.[3] Defendant's point four is denied.

---

3. Although we do not reach the issue here, we also point out that defendant's criticisms of the

In his final point on appeal, defendant claims insufficiency of the evidence. In reviewing a sufficiency challenge, the state's evidence and ensuing reasonable inferences are considered in a light most favorable to the state, and any contrary evidence must be disregarded. *State v. Livingston,* 801 S.W.2d 344, 345 (Mo. banc 1990). In examining the sufficiency of the evidence, a reviewing court does not weigh the evidence presented, but rather looks at whether a reasonable jury could have found defendant guilty given that evidence. *State v. Hood,* 680 S.W.2d 420, 423 (Mo.App.1984).

We find that sufficient evidence supported the jury's verdict. With regard to the rape count, a reasonable jury could have concluded that defendant raped victim on the basis of, among other evidence, the victim's *identification of defendant,* the DNA evidence linking defendant to the crime, the fiber analysis linking his gloves to the crime, and the fact that defendant, who was described by victim as smelling like gasoline, had a job that brought him into contact with diesel fuel.

Defendant contends that the evidence linking him to the sodomy charge is also insufficient because that evidence consists of the victim's reportedly "contradictory" testimony. However, this contention is irrelevant in the finding of insufficiency of evidence. "It is within the jury's province to believe all, some, or none of the witness' testimony in arriving at their verdict." *State v. Porter,* 640 S.W.2d 125, 127 (Mo.1982).

Finally, defendant contends that the evidence connecting him to the stealing charge is insufficient because neither neighbor saw him running with a purse, nor was a purse in his possession when police picked him up at his workplace. We find that the state presented sufficient evidence for a jury to convict on this charge as well. Victim testified that he pulled her purse off her shoulder during the attack. The purse was not recovered after the assault. It would not be unreasonable for a jury to find that defendant stole the purse.

The judgment of the trial court is affirmed.

AHRENS, P.J., and SIMON, J., concur.

FBI's "product rule" fails to show that the "product rule" method is not generally accepted by the scientific community.

A recent California appeals court opinion explains that the "product rule" method is actually the method used by scientists in interpreting DNA data in non-courtroom contexts. *People v. Smith,* 42 Cal.App.4th 204, 49 Cal.Rptr.2d 608, 612–14 (1996). The alternative "ceiling principle" method, by contrast, represents an artificially conservative method devised by the National Research Council expressly for courtroom purposes. *Id.* Designed to be a proxy for the product rule method, the "ceiling principle" method was meant to compensate for the effects of "sub-structuring," a phenomenon based on a highly controversial theory proposed by scientists Lewotin and Hartl. *Id.*

Nevertheless, as the *Smith* court points out, the standard of "scientific acceptance" is meant to measure what is generally accepted in the scientific community for use by the scientific community, not what is generally accepted in the scientific community for use by trial courts. 49 Cal. Rptr.2d at 614. The fact that scientists, themselves, use the product rule when interpreting DNA test results, and not the contrived ceiling principle, is all that need be known for scientific evidence to pass *Frye* standards.