**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Jerry L. KEIGHTLEY, Defendant–
Appellant.**

No. 25102.

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 29, 2004.

Nancy A. McKerrow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Richard A. Starnes, Assistant Attorney General, Jefferson City, for Respondent.

PHILLIP R. GARRISON, Judge.

On March 30, 2004, this court issued an opinion in this cause. On May 25, 2004, by order of the Supreme Court of Missouri, this cause was transferred to that court. On October 27, 2004, the Supreme Court entered an order retransferring the cause to this court. The original opinion of this court, which follows, is now readopted and reissued.

Jerry L. Keightley ("Defendant") appeals his convictions, after a jury trial, of one count of statutory rape in the second degree, Section 566.034,[1] and two counts of statutory sodomy in the second degree, Section 566.064. He was sentenced as a

---

1. References to statutes are to RSMo (2000) unless otherwise indicated.

prior and persistent offender to three consecutive terms of twelve years imprisonment. We affirm.

■ One of the issues raised by Defendant on this appeal concerns the sufficiency of the evidence to support his convictions. Appellate review concerning that issue is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Chaney*, 967 S.W.2d 47, 52 (Mo. banc), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998). In applying this standard, we accept as true all evidence favorable to the State, including all favorable inferences drawn therefrom, and disregard all evidence and inferences to the contrary. *Id.* Viewed in this light, the evidence shows the following:

Defendant met Sarah Bass ("Sarah") in Florida, and in 1997 they, together with Sarah's four children, moved to a trailer near Wheatland, Missouri owned by Defendant's father. One of the four children was Sarah's sixteen-year-old daughter ("Victim"), whom Sarah described as "slow." The sexual relationship between Defendant and Sarah changed so that during most of 1999 he rejected her advances, with the result that they had no sexual intercourse during most of that year. Instead, Defendant insisted that Sarah perform oral sex on him.

Unbeknownst to Sarah, Defendant had initiated a sexual relationship with Victim, beginning with an incident that occurred in the trailer when Sarah and the other children were gone. On that occasion, Defendant took Victim to the bedroom he shared with Sarah and had Victim lock the door, after which he had sexual intercourse with her. According to Victim, Defendant sexually assaulted her every few days, forcing her to perform oral sex and attempting anal sex with her. Victim also testified that when Defendant took her to the home of one of her friends, he sometimes had vaginal intercourse with her in the front seat and back of his truck. She also testified that he once placed his penis in her "buttocks," and once had her perform oral sex on him.

Sarah began to suspect that Defendant was molesting Victim because he often sent Sarah and the other children away on errands while directing that Victim stay home with him, and he also volunteered to take Victim to a friend's house that was ten miles away, taking one and one-half to two hours to return. Eventually, Sarah noticed that Victim did not want to be separated from her, and was more relaxed in Defendant's absence. Sarah also noticed that Victim tried to get her to learn to drive a standard transmission vehicle so Sarah could take Victim places in Defendant's truck, which had a standard transmission. However, when Sarah asked Victim if Defendant was abusing her, Victim said he was not. Eventually, however, Victim told an aunt what Defendant had been doing to her. The aunt reported the conversation to Sarah, who took Victim to a hospital for an examination.

Defendant was originally charged in Hickory County, Missouri with one count of statutory rape in the second degree and two counts of statutory sodomy in the second degree. The docket sheet indicates that subsequent to the filing of an information in the case, Defendant filed a "Motion to Determine Admissibility of Novel Scientific Evidence and Request for a FRYE hearing." [2] The docket sheet also indi-

---

**2.** A *Frye* hearing is a hearing outside the presence of the jury to determine the admissibility of expert testimony pursuant to the guidelines established in *Frye v. United States*, 293 F. 1013 (1923) and followed in criminal cases in Missouri.

cates that a *Frye* hearing was held on March 9, 2001, after which the trial court found that the evidence proffered by the State was not generally accepted in the scientific community and should be excluded under *Frye*. The State then filed a motion to reconsider the court's ruling "to exclude population genetics evidence." The docket sheet indicates that during argument on the motion to reconsider, the State was granted a recess, and then filed a *nolle prosequi*.

 The same day as the filing of the *nolle prosequi*, the State filed a new complaint alleging the same three counts with which Defendant was earlier charged.[3] When the information was filed in circuit court, a change of venue was granted, although the record does not indicate who requested it. The case was sent to Webster County.

Following transfer of the case, Defendant filed a motion to dismiss or, in the alternative, a motion in limine alleging, *inter alia*, that the State's *nolle prosequi* of the case after the adverse ruling on Defendant's motion to determine the admissibility of the DNA evidence, the fact that the State had not disqualified the judge who made that ruling, the fact that the State had not appealed from that ruling, and the refiling of the charges all reflected an improper attempt to obtain a different judge and avoid the prior ruling on the DNA evidence. The motion sought a dismissal of the charges or, in the alter-

native, an order prohibiting the State from introducing the disputed DNA analysis utilizing the Short Tandem Repeat ("STR") method of analysis and the STR DNA population statistics. That motion was overruled.

Defendant then filed a "Motion To Determine Admissibility of Novel Scientific Evidence" and a request for a *Frye* hearing, alleging that STR DNA testing, and the population frequency statistics used to interpret it, are a "novel form of scientific evidence which will require general acceptance by the relevant scientific community to be admissible at trial." The State also filed a motion for a pretrial ruling on the general acceptance and admissibility of "Polymerase Chain Reaction (PCR) [STR] DNA tests and results," arguing that the PCR–STR technology had gained general scientific acceptance in the pertinent scientific community. The trial court sustained the State's motion. The case was subsequently tried to a jury with the result indicated above. This appeal followed.

 In his first point on appeal, Defendant contends that the trial court erred in overruling his motion to dismiss based on the State's alleged bad faith in entering a *nolle prosequi* after the trial court ruled that DNA evidence was inadmissible, and then refiling the same charges in order to obtain a different judge. He argues that this was forum shopping for a favorable ruling on an important evidentiary issue,

---

3. Defendant's contentions that the trial court held that "the STR–DNA evidence is not generally accepted in the scientific community," and that new charges were filed on the same day as the *nolle prosequi* are found in an unverified copy of his motion to dismiss. The contents of Defendant's pleadings are not self-proving, and an appellate court cannot accept counsels' statements as a substitute for record proof, even though the court has no reason to doubt counsels' accuracy. *See AJM Packaging v. Crossland Const. Co.*, 962 S.W.2d 906, 910 (Mo.App. S.D.1998); *State v. Smith*, 944 S.W.2d 901, 921 (Mo.1997). The State, however, does not dispute the referenced statements and we may therefore consider them as though they appear in the record. Where facts stated in a brief of one party are conceded to be true in the adversary's brief, an appellate court may consider it as though it appears in the record. *Manard v. Snyder Brothers Co.*, 964 S.W.2d 487, 490, n. 6 (Mo. App. S.D.1998).

when he did not have a corresponding right to do the same.[4]

A trial court's ruling on a motion to dismiss is reviewable for an abuse of discretion. *State v. Burns*, 112 S.W.3d 451, 454 (Mo.App. W.D.2003). A trial court abuses its discretion when a ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Id.*

A *nolle prosequi* is a prosecutor's formal entry on the record indicating that a pending criminal charge will no longer be prosecuted, and results in a dismissal without prejudice unless jeopardy has attached. *State v. Flock*, 969 S.W.2d 389 (Mo.App. W.D.1998). The *Flock* court described the prosecutor's discretion to enter a *nolle prosequi* as "unfettered." *Id.* at 389 (citing *State ex rel. Griffin v. Smith*, 363 Mo. 1235, 258 S.W.2d 590, 593 (1953)). In *Griffin*, the Supreme Court of Missouri said that the discretion vested in a prosecutor placed in him the sole power to determine when he should proceed with a prosecution or dismiss it. *Id.* at 594.[5]

This court has held that "[t]he fact that the [S]tate previously chose to *nolle prosequi* the same case against defendant after a trial court granted a motion to suppress evidence, rather than to appeal the ruling, is of no consequence." *State v. Maggard*, 906 S.W.2d 845, 848 (Mo.App. S.D.1995). In deciding that a prior ruling on a motion to suppress did not have res judicata effect when the charges were dismissed and subsequently re-filed, the

western district of this court noted "that prosecutors enjoy a discretionary right to dismiss a case at anytime" and "may refile the charges as [they] see[ ] fit so long as double jeopardy has not attached." *State v. Pippenger*, 741 S.W.2d 710, 712 (Mo. App. W.D.1987). Likewise, according to the general rule, a *nolle prosequi*, if made prior to the time a jury is impaneled and sworn, is not a bar to a subsequent prosecution for the same offense. *State v. Lonon*, 331 Mo. 591, 56 S.W.2d 378, 380 (1932).

The preceding cases make it clear that the prosecutor had discretion, under the circumstances here, to enter a *nolle prosequi*. Defendant acknowledges that Missouri courts authorize the exercise of such discretion, but urges that "[i]t is time for Missouri to join the majority of other state jurisdictions, and federal courts, in placing some limitation on the State's unfettered discretion to enter a *nolle prosequi* in a case and then to refile the exact same charges when the State is motivated by bad faith and [a defendant] is prejudiced."

In support of this request, Defendant cites us to a number of opinions from other states, some of which hold that approval of the trial court is required before a prosecutor may *nolle prosequi* a criminal charge and then refile the same charge. He encourages us to similarly hold that a prosecutor no longer has complete discretion to *nolle prosequi* a case and refile it later. We have established, however, that to do so would require us to ignore numerous precedents of this state, including from our supreme court. *See Griffin* at 594; *Lonon* at 380. We are constitutionally

---

4. The record on appeal here does not include any of the documents from the Hickory County case with the exception of the docket sheet. The State, however, does not contest the accuracy of the factual basis for Defendant's contention in this point relied on.

5. *Griffin* was overruled in *State v. Honeycutt*, 96 S.W.3d 85, 89 (Mo. banc 2003), to the extent it could be read to hold that the trial court did not have authority to dismiss a criminal case for failure to prosecute.

bound to follow the most recent controlling decision of the Supreme Court of Missouri. *State v. Grisham,* 918 S.W.2d 926, 927 (Mo.App. S.D.1996); Mo. CONST. art. V, § 2. Accordingly, Defendant's first point is denied.

■■■ Defendant's second point assigns trial court error in denying his motion for judgment of acquittal at the close of all the evidence, in accepting the jury's guilty verdict, and in sentencing him on Count II of the information charging him with statutory sodomy. Specifically, Count II charged Defendant with having "deviate sexual intercourse" with Victim. The verdict director on that count authorized the jury to find Defendant guilty as to Count II if it found that Defendant put his penis in Victim's mouth, and that doing so constituted deviate sexual intercourse. In support of this point Defendant argues that Victim's testimony on that issue was so contradictory that it could not be relied upon and, without corroboration, left the mind "clouded with doubt" concerning his guilt. Thus, according to Defendant, the evidence was insufficient to establish his guilt beyond a reasonable doubt.

In support of this point, Defendant notes that at trial, Victim testified that, on one occasion, in the bedroom of their home, Defendant put his penis in Victim's mouth for a few minutes, and that on another occasion, in Defendant's truck, he "had [Victim] try to suck on [Defendant's penis] one time," but that she told him she did not want to. Victim later testified that Defendant put his penis in her mouth "once or twice."

On cross-examination, the following exchange occurred:

Q: Do you remember when [the prosecutor] asked you this question: "Did he ever ask you to suck on his penis?" Do you remember that question?

A: Yes.

Q: Do you remember what your response was?

A: No, I don't.

Q: "He did once or twice. I didn't do it." Do you remember that?

A: No.

Q: Do you remember the next question, "You didn't do it? Did you ever put your mouth on his penis?" Do you remember that question?

A: No.

Q: Your answer was, "No." Do you remember that?

A: No.

Q: Next question, "Did he ask you to do that?" Do you remember that question?

A: Yes.

Q: What did you say to that?

A: Yes.

Q: Yeah or yes?

A: Yes, he did.

Q: The next question was, "Did he ever touch his penis to your mouth?" Do you remember that question?

A: Yes.

Q: Your answer was apparently inaudible so [the prosecutor] said, "I'm sorry?" Do you remember that?

A: Yes.

Q: And your answer was, "No."

Did you try to tell the truth last summer when you were testifying?

A: Yes.

On redirect, Victim testified as follows:

Q: [Victim] [Defendant's counsel] asked you if you remembered previously testifying in a courtroom where he had the opportunity to ask you questions when you were under oath. Is that right?

A: Yes.

Q: Do you remember that happened more than one time? Do you remember that?

A: Yes.

. . . .

Q: . . . during those previous times, have you testified that the defendant put his mouth in your penis [sic]?

A: Yes.

Q: Do he do that? [sic]

A: Yes.

Defendant argues that because of the allegedly contradictory testimony given by Victim concerning oral sodomy, corroboration was required, and since there was no corroborating evidence, there was insufficient evidence to support the conviction under Count II. We disagree.

■■■■ No corroboration of a victim's testimony is needed for submission of a charge of rape or sodomy, but if that testimony is inherently contradictory or such as to leave the mind clouded with doubt, it must be corroborated or the conviction will not stand. *State v. Smith*, 679 S.W.2d 899, 902 (Mo.App. S.D.1984). This is not because the victim's testimony cannot stand alone, but because the law does not allow an inference of fact from evidence not substantial or probative of that fact. *Id.* To trigger the "corroboration rule," the victim's testimony must be so contradictory or in conflict with physical facts, surrounding circumstances, and common experience as to be unconvincing. *State v. Kuzma*, 751 S.W.2d 54, 58 (Mo.App. W.D. 1987). In *State v. Edwin Davis*, 903 S.W.2d 930 (Mo.App. W.D.1995), the court held that "[u]nless the testimony of the victim on an essential element leaves the mind 'clouded with doubts,' corroboration is not required." *Id.* at 934.

The State counters that the "corroboration rule" does not apply here because it is triggered only by inconsistencies in the victim's trial testimony, and not between the trial testimony and out-of-court statements. Indeed, some Missouri courts, including this one, have made such statements in interpreting the corroboration rule. *See State v. Kuhlenberg*, 981 S.W.2d 617, 621 (Mo.App. E.D.1998); *State v. George*, 921 S.W.2d 638, 643 (Mo.App. S.D. 1996); *State v. Creason*, 847 S.W.2d 482, 485 (Mo.App. W.D.1993).

Holding to the contrary, however, is *Kuzma*, where the court acknowledged existing debate as to what sort of inconsistent statements may be considered in determining whether to apply the corroboration rule, but held that its understanding of prior cases compelled the conclusion that courts had previously based that determination on inconsistent statements made at trial, in a deposition, in out-of-court statements to a third party, and various combinations of those sources. *Id.* at 58.

■■■ We need not attempt to reconcile those contradictory views here because the allegedly inconsistent statements made by Victim at preliminary hearings were not proven. If a witness unequivocally admits making prior inconsistent statements, further proof of those statements is unnecessary because the witness has admitted making them. *State v. Wilson*, 105 S.W.3d 576, 585 (Mo.App. S.D.2003). If the witness, however, equivocates or professes not to remember if a prior statement was made, a foundation has been laid for its admission. *Id.*

■■■ In this case, Victim's trial testimony was internally consistent. As indicated above, defense counsel attempted to impeach Victim's testimony by cross-examining her about statements she allegedly made at preliminary hearings. Victim never admitted having made the statements relied upon by Defendant as the

basis for invocation of the corroboration rule, and we are not directed to any place in the record where those statements were introduced into evidence.[6] We are unable to conclude that there was a sufficient showing of inconsistency to require invocation of the corroboration rule, rendering irrelevant the issue whether inconsistencies between trial testimony and other statements are sufficient to trigger the rule. *See State v. Gardner*, 849 S.W.2d 602, 604 (Mo.App. S.D.1993). In giving deference to the trier of fact, there was sufficient evidence from which a reasonable juror might have found Defendant guilty beyond a reasonable doubt. *Chaney* at 52. Accordingly, this point is denied.

▮▮▮ In his third and final point, Defendant contends that the trial court abused its discretion in granting the State's motion for a pretrial ruling on the general acceptance and admissibility of PCR–STR DNA testing technology, and denying his motion to determine the admissibility of novel scientific evidence and request for a *Frye* hearing, and in admitting the State's DNA evidence. He argues that these rulings denied him the opportunity to prove that STR technology is not generally accepted in the scientific community "because the primer sequences of the test kits used, Profiler Plus and Cofiler, have not been released to the scientific community for peer review and verification of the validity of the method to produce reliable results."

In its ruling on these motions, the trial court acknowledged that *Frye* is the standard in Missouri for the introduction of expert testimony,[7] and held that a *Frye* hearing is not required when an overwhelming majority of jurisdictions have found the evidence in question to be generally acceptable in the scientific community. It held, after a review of cases and technical articles presented by the parties, that the PCR–STR DNA testing technology is generally accepted in the scientific community, and that the request for a *Frye* hearing was overruled as it related to PCR–STR DNA testing, Profiler and Cofiler test kits, and interpretive statistics.

▮▮▮ As indicated above, Missouri courts follow the *Frye* standard in determining the admissibility of scientific evidence in criminal cases. *State v. Ralph Davis*, 814 S.W.2d 593, 600 (Mo. banc 1991). Under that standard, scientific evidence may be admitted only if the procedure is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* (quoting *Frye* at 1014). The failure to hold a *Frye* hearing does not require reversal unless the evidence was improperly admitted because there was insufficient evidence to prove that the scientific evidence had gained general acceptance in the scientific community. *State v. Salmon*, 89 S.W.3d 540, 544 (Mo.App. W.D.2002).

---

6. One of the questions defense counsel posed to Victim was whether she had been asked if Defendant touched his penis to her mouth, and while she admitted remembering that question, defense counsel asked (or, more appropriately, stated), "And your answer was, 'No.' Did you try to tell the truth last summer when you were testifying?" Victim's "yes" answer obviously referred to the fact that she tried to tell the truth when testifying earlier, and not that she had said that Defendant did not touch his penis to her mouth.

7. We are cognizant of our supreme court's holding in *State Bd. Of Registration for the Healing Arts v. McDonagh*, 123 S.W.3d 146, 153 (Mo. banc 2004), stating that Section 490.065, and not *Frye*, is the applicable standard for determining the admissibility of expert testimony in civil cases. This does not, however, affect the applicability of *Frye* to criminal cases.

Initially we note that Missouri courts have previously held that the STR technique is generally accepted in the scientific community. *See Salmon* at 545. Here, Cary Maloney ("Maloney"), a criminalist supervisor at the Missouri State Highway Patrol Crime Lab (the "Patrol Crime Lab"), testified that the lab had used the STR technique since June 1999, and that it is generally accepted in the forensic scientific community. Maloney also testified to that technique's general acceptance in *Salmon. Id.* at 544.

Maloney also testified in this case that the Patrol Crime Lab uses the Profiler Plus and Cofiler primer kits.[8] According to Maloney, the use of both of these kits produces an internal quality control check, and the results of the testing in this case demonstrated the presence of Defendant's sperm in Victim's panties.

Defendant called Dr. Dean Stetler ("Stetler"), an associate professor in the Department of Molecular Bio-sciences at the University of Kansas. Stetler testified that the Profiler Plus and Cofiler kits were first put on the market in 1998, but that he was concerned that not all components of the kits had been fully defined and subjected to peer review and independent testing. He acknowledged that the kits in question had been utilized in validation studies in 1996 or 1997, and that the results of those studies were published in early 2002. His complaint was that the validation studies had been performed by the manufacturer of the Profiler Plus and Cofiler kits, as well as "a few other laboratories that did little pieces of the validation studies." We are not, however, directed to any testimony by Stetler expressing an opinion that the technique used in this case

was not generally accepted in the forensic scientific community.

■ The Supreme Court of Missouri has held that the manner in which DNA tests are conducted goes more to the credibility of the witness and the weight of the evidence, which is, in the first instance, a discretionary call for the trial court and, ultimately for the jury. *Ralph Davis* at 603; *see also State v. Daryl Davis,* 860 S.W.2d 369, 374 (Mo.App. E.D.1993). In *State v. Huchting,* 927 S.W.2d 411 (Mo. App. E.D.1996), the defendant argued that *Ralph Davis* should be interpreted as holding that aspects of DNA testing such as testing technique, laboratory conditions, or statistics used to interpret test results merit separate *Frye* hearings. *Id.* at 417. In support he argued that the DNA evidence in that case was unreliable because the laboratory had used unaccredited procedures, unspecified protocols, and procedures and statistics that had never been reviewed and approved by a higher court. *Id.* at 418. The *Huchting* court held that the admissibility of expert testimony regarding various components of DNA evidence, including the admissibility of any expert testimony, rests largely within the discretion of the trial court, whose determination will not be disturbed on appeal unless an abuse of discretion is shown. *Id.* It found that the defendant had ample opportunity during cross-examination to discredit the manner in which the DNA tests were conducted. *Id.*

We addressed a claim similar to Defendant's in *Faulkner.* There the defendant argued that "the primers contained in the Profiler Plus and Cofiler kits have not been released to the scientific community for peer review and verification of the validity of the method to produce correct

---

**8.** As explained in *State v. Faulkner,* 103 S.W.3d 346, 358 (Mo.App. S.D.2003), a "primer" is a sequence of nucleotides, which is a component of DNA, which determines where a DNA molecule is to be copied.

results and thus [were] not generally accepted in the scientific community." *Id.* at 357. We held that concerns relating to the reliability of the results produced by the test kits did not implicate the reliability or general scientific acceptance of the principles on which the STR test itself is based. *Id.* at 359.

■ As in *Faulkner,* we hold that concerns relating to the use of the Profiler Plus and Cofiler kits do not implicate the reliability or general scientific acceptance of the principles on which the STR test itself is based. Rather, the manner in which the tests were conducted goes to the credibility of the witness and the weight of the evidence. *Huchting* at 417–418; *Daryl Davis* at 374. The failure to grant a *Frye* hearing outside the presence of the jury was not, under these circumstances, error or prejudicial to Defendant. *Salmon* at 544; *Huchting* at 418. This point is denied.

The judgment of the trial court is affirmed.

BARNEY, P.J., and PREWITT, J., concur.