**STATE of Missouri, Respondent,**

v.

**Darryl BLOCKTON, Appellant.**

**No. 49485.**

Missouri Court of Appeals,
Eastern District,
Division Two.

Nov. 26, 1985.

Motion for Rehearing and/or Transfer
Denied Jan. 14, 1986.

Application to Transfer Denied
Feb. 18, 1986.

---

David C. Hemingway, Public Defender, St. Louis, for appellant.

John Munson Morris, Asst. Atty. Gen., Mark A. Richardson, Jefferson City, for respondent.

REINHARD, Judge.

Defendant was charged and convicted by a jury under a multiple count indictment. The court found him to be a prior offender and sentenced him as follows: Count I, life imprisonment for felony forcible rape; Count II, III and IV, concurrent sentences of seventy-five years for felony forcible rape; Count V, a concurrent sentence of fifteen years for felony forcible rape; Count VI, fifteen years for kidnapping, to be served consecutive to the sentences imposed in Counts I–V.

In Counts II–V of rape, defendant was found guilty of acting with others in committing the rapes. The act was allegedly committed in Count I by defendant, in Count II by Matthew Jackson, in Count III by George Williams, in Count IV by Willie Gibbs and in Count V by an unknown person. Defendant appeals. We find no merit to his appeal, but remand to the trial court with instructions that defendant's sentences for rape be ordered to be served consecutive to each other pursuant to § 558.026.1, RSMo Cum.Supp.1984.

Defendant raises three points on appeal. He first contends that the court erred in submitting jury instructions which omitted the definition of "serious physical injury," a term used in the definition instruction on "forcible compulsion." His second point is that the court erred in overruling his motion for judgment of acquittal on Count V because the evidence failed to show that he possessed the required intent regarding the unknown perpetrator of the rape. He also asserts that the court erred in refusing to admit a certified transcript of the motion to suppress identification hearing, which contained a prior inconsistent statement by Officer Darris.

A detailed recitation of the facts is necessary for a resolution of the issues raised on appeal.

Prosecutrix testified that after leaving work in the early morning hours of August 9, 1983, she drove her car to a friend's house, and was parking on the street when she noticed two men approaching. Her headlights were on, and she was near a street light, so she was able to see defendant moving towards her front bumper. After defendant asked for a match, she began to roll her window up. Before she could finish, he reached inside and opened her door. He placed a pistol to her head saying, "Shut up, bitch. Move over. Don't holler and don't do nothing wrong." At the intruder's command she unlocked the passenger door to let another man into the car, who proceeded to rifle her purse. Defendant drove her car a short distance and picked up two more men, who got into the back seat. They took her glasses and threw a shirt over her head. When the driver reached his destination they uncovered her head and led her out of the car. Defendant told her to be quiet and act natural. She noticed other people in the yard, but defendant blocked her view by wrapping his arm around her neck as if hugging her. Defendant then shoved her into a dark garage, where a woman seated in the room told her to be quiet. Defendant made the woman leave the garage. He ordered the prosecutrix to lie down on a bed and remove her underpants, and had intercourse with her. Defendant then opened the garage door and asked who wanted to be next. The man who sat next to her in the front passenger seat of her car had intercourse with her next, followed by one of the men who had been in the back seat, and then the other male in the back seat. After the three passengers had raped her, defendant reappeared and told her he was taking her car to East St. Louis to get liquor. Before defendant left, he told them to shoot her if she did anything wrong. As he was leaving, she heard people outside call him "Bootsie." She was left in the garage with two men, one of whom held a gun which she heard clicking in the darkness. She was able to tell by his voice that he was a man she had seen in the car. He left and returned with two new males, who both had intercourse with her.

When defendant returned and learned that she had been molested he yelled at the other men, saying that he had left orders that no one should "f___ with her." He also yelled at her to not let anyone touch her. Defendant and the three original passengers then left with the prosecutrix in her car. She was forced to lie with her head down, her face covered with clothing. The garment was removed from her face at a lighted gas station, where the men left the car for a few minutes. They then resumed driving, stopping again to let the three passengers steal a bicycle from a man they spotted on the street. One man left with the bicycle, but the others returned. Defendant continued driving, ultimately dropping off everyone but the prosecutrix. At some point during the drive she was told that if she "made any moves" she would be shot. As daylight approached defendant returned to the garage with the victim and yet another passenger picked up during the drive. Defendant apparently went to sleep, as did the prosecutrix. She was awakened by the passenger, whom she told about the night's events. Although he said that he feared the defendant, he allowed her to leave the garage. She then ran to a house nearby and called

the police, whereupon she was taken to the hospital for an examination. Her purse was later found and returned to her. Subsequently, prosecutrix identified the defendant from a group of photographs. She also identified the defendant and Jackson in a line-up. Because the garage was dark, she could not see their faces during the actual rapes. However, she saw them at various points during her ordeal, and while in the garage could identify the rapists by their voices.

The state called Matthew Jackson as a witness. Prior to the trial, he pled guilty to the rape and kidnapping of the prosecutrix. He testified that he had known the defendant, who dated his sister, for quite some time. The defendant was often called "Bootsie." On the eve of the offense, he was walking with his brother, Willie Gibbs, his cousin, George Williams, and defendant when he saw defendant force his way into prosecutrix's car with a "gas gun." The gun fired only gas bullets or blanks. Defendant then drove the car over to pick up the others, and headed to a garage in Pine Lawn. En route, defendant ordered them to cover her head and to go through her purse. Defendant's cousins lived next to the garage, which Jackson had visited before. A female cousin opened the garage door for them. Jackson testified that he and a number of other men entered the garage to have sexual relations with the prosecutrix at various times during her captivity. The other men included defendant, Williams, a cousin of defendant's and a man not known to Jackson. When defendant left he told Jackson to watch the prosecutrix. Following defendant's return, the four original participants left to get gas, taking her with them. Jackson and Williams used a gun to rob a man when they stopped for gas. Gibbs stole a bicycle during the group's next stop.

George Williams also testified for the state. He had previously pled guilty to rape of the prosecutrix and had received a sentence of twenty-five years, to run concurrently with a sentence for robbery. Williams stated that the men had two gas guns that night, which looked like normal guns. He stated that although all the men in the car and defendant's cousin sexually attacked the prosecutrix, defendant had pulled him off of her before he could have intercourse, ordering him to wait until later. Then defendant left with Gibbs to get alcohol, telling them to watch her and to not let anyone "mess with her" until he returned. As soon as he left, defendant's cousin said, "Forget what Darryl say. I'm going to do it," and proceeded to force prosecutrix to perform an act of sodomy. At this point Jackson had the gun, and around five men were in the garage. Williams' comments about the subsequent events of the night confirmed that the incidents of robbery occurred as the men drove around with the prosecutrix.

■ In defendant's first point on appeal, he maintains that prejudicial error resulted from the court's failure to submit a definition of the term "serious physical injury" to the jury. Defendant was convicted of five counts of forcible rape. The pattern verdict directing instruction for these crimes included the term "forcible compulsion." *See*, MAI–CR2d 20.02.1. This term must be defined "whether the definition is requested or not." Notes on Use, MAI–CR2d 20.02.1. Accordingly, the trial court submitted the following definitional instruction:

> Forcible compulsion means either,
>
> (a) Physical force that overcomes reasonable resistance, or
>
> (b) A threat, expressed or implied, that places a person in reasonable fear of death, *serious physical injury* or kidnapping of himself or another....
>
> MAI–CR2d 33.01 (emphasis added).

As can be seen, this definition contains the phrase "serious physical injury." The Notes on Use to the pattern instruction used also require the phrase "serious physical injury" to be defined "whether the definition is requested or not." The phrase "serious physical injury" is defined as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment

of the function of any part of the body." MAI–CR2d 33.01. The trial court failed to submit a definition of this phrase, thus committing error.

Having found error, we must consider whether the error was prejudicial, requiring a reversal. We think not. Judge Satz, speaking for our court in *State v. Chaney*, 663 S.W.2d 279 (Mo.App.1983), analyzed the effect of the failure to define "serious physical injury" under similar circumstances. He stated:

In the present case, the phrase "serious physical injury" does not appear in the verdict director itself, but as noted, it is contained in the definition of "forcible compulsion." Literal interpretation of the Notes on Use and strict logic require that the phrase "serious physical injury" also be defined, and, therefore, the failure to define this phrase is error. *State v. Rodgers*, 641 S.W.2d 83, 85 (Mo.1982); *State v. Ogle*, 627 S.W.2d 73, 74 (Mo.App. 1981). The prejudicial effect of this error, however, is judicially determined. *State v. Rodgers, supra* at 85; Rule 28.-02(e).

Two cases recently before this court contain fact patterns in which a defendant allegedly used a knife while committing the crimes of rape and sodomy. *State v. Allbritton*, 660 S.W.2d 322 (E.D. Mo.1983); *State v. Van Doren*, 657 S.W.2d 708 (E.D.Mo.1983). In each of these cases, as in our own, the trial court defined "forcible compulsion" but failed to define "serious physical injury." In those cases, as here, the issue was considered under the doctrine of plain error. In each case, the Court found no plain error.

In *Allbritton* and *Van Doren* the Court noted the phrase "serious physical injury" is defined as "... physical injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." MAI–CR2d 33.01. In those cases, the Court found no manifest injustice resulted from the failure to give this definition, because use of a knife clearly

indicates the victim is threatened with the substantial risk of death, or serious permanent disfigurement or loss of a bodily organ. This reasoning is as sound here as it was in *Allbritton* and *Van Doren*. Defendant here used a knife and the victim thought defendant was going to kill her. *No additional clarification was needed by the jury. The facts spoke for themselves. When a knife is placed close to or against a victim's body to force the initiation and completion of a sexual act, surely the jury's definition of "serious physical injury" would be no different than that given by the MAI. Thus, the jury's inferences would not have been changed one bit by the MAI definition of the term "serious physical injury."* (footnote omitted) (emphasis added).

*Id.* at 283, 284.

In *Chaney, Allbritton* and *Van Doren* the issue had not been preserved, and therefore was being examined under the plain error doctrine. Nevertheless, the line of reasoning elucidated in these cases is applicable to the facts before us. Here, defendant forced his way into the victim's automobile while holding a gun to her head and saying, "Shut up, bitch. Move over. Don't holler and don't do nothing wrong." His three friends then entered the car. They took the victim's glasses and covered her head with a shirt. She was taken to a dark garage and raped by at least five men. While there is no direct testimony that the gun was held to her body during the rapes, it defies logic to argue that the gun's presence did not supply the threat of "serious physical injury" which placed prosecutrix in reasonable fear that she would suffer a "substantial risk of death" or "serious disfigurement" unless she submitted to her captors' demands. MAI–CR2d 33.01. As in *Chaney*, the facts spoke for themselves. The court's error in failing to define "serious physical injury" was not prejudicial.

Defendant also contends that the trial court erred in refusing to admit a certified transcript of the motion to suppress identification hearing held June 29, 1984. De-

fendant asked for admission for impeachment purposes, as the transcript contained a prior inconsistent statement by Detective Tony Darris of the Pine Lawn Police Department. He spoke with the victim shortly after her ordeal ended, both in the hospital and at the police station. On direct examination, he stated that she mentioned the name "Bootsie" to him. Upon running a computer check on the name, defendant's name appeared. The victim picked defendant out of a photo line-up, and later identified him at a live line-up.

On cross examination, defense counsel asked whether Darris had stated at the suppression hearing, under oath, that he did not receive a description of any assailants from the prosecutrix. Darris responded that he did not recall making such a statement. Defense counsel then read from the hearing transcript Darris' comment "she didn't give me a description," and asked whether he denied making the statement. Darris replied "No sir, I don't." He later said "I don't remember making that statement. If I did, apparently it was in error, I did get a description."

■ Shortly after this exchange, the transcript was handed to Darris. At the end of cross-examination, counsel moved to admit the transcript taken by the official court reporter. The prosecutor objected to its admission, contending that the prior statement could be used only for impeachment purposes unless the court reporter testified to Darris' former statements. The court reserved its ruling, indicating that it was the court's opinion that the transcript was not admissible because Darris did not deny making the former statements. No challenge was made to the official nature of the suppression hearing transcript, which was properly certified. Clearly, where an inconsistent statement appears in an official written transcript, it is admissible as evidence. *See, State v. Alexander,* 499 S.W.2d 439, 444 (Mo.1973). Therefore, the transcript could be used to prove Darris' previous testimony if a proper foundation was laid for impeachment purposes.

It is unequivocal admission of the prior statement which bars its use. When a witness equivocates about a prior statement, it may be shown that he made a previous inconsistent statement. Thus, if a witness professes not to remember if a prior statement was or was not made, a proper foundation has been laid to admit the prior inconsistent statement.

*State v. Jones,* 652 S.W.2d 880, 882 (Mo. App.1983).

The witness did not unequivocally admit making the prior statement. Darris said that he did not recall making it, and that if he did he was mistaken. The trial court erred in failing to admit the transcript into evidence. As in *Jones,* however, we have available to us the entire transcript. It is evident from the transcript that on direct testimony at the suppression hearing Darris stated that the victim gave a description of the man called "Bootsie." However, on cross-examination during the suppression hearing, Darris made a contrary statement. Although the transcript was not admitted into evidence, we believe on our review of the record that the defendant had virtually the full benefit of the transcript. During cross-examination at trial, when Darris was questioned about his previous testimony at the suppression hearing, he was handed the hearing transcript. Furthermore, during closing argument, without objection, defense counsel referred to Darris, saying:

[H]e stated on June 29th in response to a question, "Did you get a description from [prosecutrix] of the person she claimed was Bootsie?" "No, I didn't get a description. The only thing I got was Bootsie." ... Now, jurors, he tried to change his story here at trial. He couldn't recall saying that, and if he recalled, he was in error, but he has been a policeman for too many years not to know what a Motion to Suppress is about.... Any police official knows what a Motion to Suppress is all about that [sic]. It is too late for him to come in here at trial and change his story and state that he was in error then. He was under oath when he made that state-

ment. Now, you will be instructed that when a witness gives an inconsistent statement, you can use that to affect the credibility of the testimony he has given, and I'm telling you that Tony Darris's testimony was fabrication when you all heard it, because believe me, if he would have had a description of the assailant that [prosecutrix] claimed was the ringleader, he would have told the story when he was here on June 29th.

Any error in failing to admit the transcript was not prejudicial.

■ Defendant's last point on appeal is that the court erred in submitting jury Instruction No. 14, the verdict director for Count V, and in overruling defendant's motion for judgment of acquittal on the count. Instruction No. 14, which was modeled after pattern verdict directing instruction MAI–CR2d 2.12, provided:

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

As to Count V, if you find and believe from the evidence beyond a reasonable doubt:

\* \* \* \* \* \*

Fourth, that with the purpose of promoting or furthering the commission of rape, the defendant aided or encouraged another person unknown in committing that offense, then you will find the defendant guilty under Count V of rape.

Defendant contends that because the evidence showed he was absent during this rape, and had left instructions that the men in the garage were not to molest the prosecutrix, he did not possess the required intent to share the criminal purpose. There was evidence that defendant told the men to refrain from attacking the victim in his absence, and rebuked them when he found his words disregarded. On the other hand, there was also evidence that defendant

gave orders for the men to guard the prosecutrix and shoot her if necessary.

We believe defendant's contentions are answered by *State v. Logan*, 645 S.W.2d 60 (Mo.App.1982). There, similar arguments were made where defendant participated in the planning and execution of a gas station robbery, although he was not present at the robbery itself. During the robbery, those directly committing the offense took an automobile from another party. Defendant was convicted of both the robbery of the station and the automobile robbery. Defendant contended that § 562.036, RSMo 1978 and § 562.041, RSMo 1978 did not authorize a defendant to be convicted of an offense committed by other persons when he did not initially contemplate that offense. Judge Lowenstein, speaking for the court, rejected defendant's contentions saying:

Again, the Missouri criminal code requires both criminal responsibility for conduct *and* a culpable mental state for all offenses. "To be guilty of an offense the defendant must himself have the necessary culpable mental state for that offense, but his liability can be based upon the conduct of another person." The New Missouri Criminal Code: Manual for Court Related Personnel § 7.8, *supra*. As to conduct, §§ 562.036 and 562.-041 state that the accomplice may be held responsible for "the conduct" of the principai if he purposefully promotes "an offense", without limiting the scope of that conduct. Thus, if defendant Logan purposefully promoted the service station robbery, §§ 562.026 and 562.021 deem him responsible for all of the conduct that ensued thereafter. Here, the jury was properly instructed and found that defendant purposefully promoted the initial robbery, and no error resulted from finding him "criminally responsible" for the conduct of his companions.

The code limits a defendant's liability for such other conduct, however, with its ubiquitous requirement of a "culpable mental state." §§ 562.016.1 and 562.036. For example, if defendant had purposely promoted only the service station rob-

bery, but one of the active participants proceeded to rape a female customer unbeknownst to defendant, defendant may be held "criminally responsible" for all of the participant's conduct, including the rape, but would not be held liable for the rape unless he had "the required culpable mental state" for that conduct.... The code is in line with modern principles of legal justice in considering conduct such as the rape too attenuated from the accomplice's intended conduct to find liability. *See generally*, W. LaFave & A. Scott, *Criminal Law*, 364, p. 511 (1972).

\* \* \* \* \* \*

Although the code does not specifically address the required mental state of an accomplice for a crime not initially contemplated, the MAI–CR2d's requirement of "knowledge" certainly complies with the code. The MAI–CR2d provisions recognize that an accomplice who, when he promotes one crime, has knowledge that other crimes may occur, has a "culpable mental state" with regard to those other crimes. Nothing more should be required.

*Id.* at 64–66.

In the present instance, all the evidence indicated that the man in charge of these activities, from the time of the kidnapping until the victim's escape, was defendant. He left a woman in the custody of armed men who had previously violated her body with the admonition, "Don't let anybody mess with her until I get back." This statement alone cannot relieve defendant of liability under the circumstances here. Defendant promoted the crime of kidnapping with the purpose of raping prosecutrix. He raped her, encouraged others to do so, and left her under circumstances from which a jury could find that he had the "culpable mental state" as to the offense charged and submitted under Count V. The court did not err in submitting Instruction No. 14, and in overruling defendant's motion for judgment of acquittal on this Count.

■ The state raises one contention on appeal, asserting that this court should re-mand to the trial court for resentencing in accordance with § 558.026.1, RSMo Cum. Supp.1984. We agree. In the present case, the trial court imposed concurrent sentences for each count of rape. This result is contrary to the mandate of § 558.-026.1 which requires a sentence imposed on a sex crime to be consecutive to the sentence for any other sex crime. *State v. Shaw*, 701 S.W.2d 514, 517–18 (Mo.App. E.D.1985); *Adams v. State*, 688 S.W.2d 401, 403 (Mo.App.1985); *State v. Toney*, 680 S.W.2d 268, 273 (Mo.App.1984).

We vacate the concurrent sentences imposed for defendant's five convictions for rape and remand to the trial court with instructions that defendant's five sentences for rape be ordered to be served consecutive to each other pursuant to § 558.026.1, RSMo Cum.Supp.1984. In all other respects the judgment is affirmed.

DOWD, P.J., and CRIST, J., concur.