STATE of Missouri, Plaintiff–
Respondent,

v.

Joseph Ronald WILSON, Defendant–
Appellant.

No. 24525.

Missouri Court of Appeals,
Southern District,
Division Two.

June 3, 2003.

Craig A. Johnston, Assistant State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Nicole E. Gorovsky, Assistant Attorney General, Jefferson City, for respondent.

JAMES K. PREWITT, Presiding Judge.

Following jury trial, Joseph R. Wilson ("Defendant") was convicted of murder in the first degree, § 565.020, RSMo 2000, and armed criminal action, § 571.015, RSMo 2000, and sentenced to life imprisonment on both counts, with the sentences to be served consecutively. With three points relied on, Defendant contends that the trial court abused its discretion in precluding Defendant from presenting particular evidence regarding his brother, clearly erred in overruling his motion to suppress and in allowing the testimony of a witness concerning statements that were allegedly unconstitutionally obtained, and erred in refusing to submit a jury instruction proffered by Defendant.

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. On April 15, 1997, Kathleen Reine Scofield spoke with her seventeen-year-old son, Kit Workman, and made arrangements to pick him up from his grandparents' house in Branson the next day. However, Kit was not there when his mother returned for him; he had left with Defendant to stay at the home of Defendant and Defendant's wife, Crystal.[1]

Defendant had met Kit several months earlier through Crystal and her brother, Gabe, and when Kit contacted Defendant asking for a place to stay, Defendant and Crystal decided to allow him to live with them "until [Kit] could figure out what was going on." Kit stayed with them for approximately one week. As background, Kit had left the home of his mother and stepfather in mid-March, and had lived with various friends in addition to his grandparents during March and April, but by April 15, Kit's grandparents had asked him to leave their home.

At some point when Kit was living at Defendant and Crystal's home, Defendant had a conversation with his mother, Cathleen Wilson, during which Defendant was upset and crying. Gabe had informed Defendant that Kit and Crystal were having sex, and Defendant had verified the information after hearing Kit and Crystal

---

1. We will refer to many of those involved by their first names. We mean no disrespect.

through an open window of Defendant's house. Defendant told his mother that "he thought his marriage was over," and that "he was going to kill that Mother Fucker Son of a Bitch."

Also during the time that Kit was living with Defendant and Crystal, Defendant went to his brother Ray's house and told Ray he wanted to go target shooting in Merriam Woods near their mother's house. Per Defendant's instructions, Ray retrieved a gun he had in his home and put it behind the seat of his pickup. The two drove to Defendant's house in separate vehicles, with Ray driving his pickup. Defendant told Ray that Kit was at the house and that Kit wanted to "smoke a bowl," meaning that Kit wanted to smoke marijuana.

Defendant, Ray, and Kit left Defendant's home in Ray's pickup and drove to Cathleen's house in Merriam Woods; all three smoked marijuana. After stopping at Cathleen's house, the three continued to a location chosen by Defendant near Lake Maybee. When they arrived at the location, Ray took the gun out of the pickup and handed it to Defendant and the three men started walking to the lake. Although Ray made a suggestion as to where to target practice, Defendant indicated he thought it would "be better up on the other side of the hill." Ray and Kit followed Defendant up the hill.

The men stopped at a clearing area where Defendant pointed and said, "Look, you can see Mom's house from here." As Ray and Kit turned around to see where Defendant was pointing, Defendant shot Kit.

Defendant grabbed Ray by the arms and told him to "come on." Defendant and Ray went back to the pickup and Defendant told Ray to take him home. During the trip to Defendant's house, Defendant held the gun in his hands and instructed Ray to never go back to the place where Kit was shot and to say nothing about the incident. After they reached Defendant's house, Defendant put the gun behind the seat of Ray's pickup and then followed in his own vehicle to Ray's house. Once there, Defendant took the gun out of Ray's pickup, fired it several times, brought the gun into Ray's house, wiped it off, and returned it to Ray's bedroom.

Kit's mother and stepfather, not knowing where Kit was staying, became concerned when they had not heard from their son for more than a week. After checking with friends and acquaintances of Kit's regarding his whereabouts, they learned that Kit was last seen with Defendant. Kit's stepfather attempted to call Defendant and spoke with Crystal, and eventually received a phone message from Defendant, the contents of which were not received into evidence at trial. A missing person's report was filed on May 2, 1997.

On May 27, 1997, Donald Swan ("Investigator"), who was at the time employed by the Taney County Sheriff's Department as a criminal investigator, interviewed Defendant. Defendant told Investigator that Kit had stayed with Defendant for a couple of days and, after Defendant found Kit with what Defendant thought to be narcotics, Defendant drove Kit to Springfield and "put him on a bus." Later that same day, Defendant changed his story twice, first stating that he had dropped Kit off in front of the bus station, and then stating that he had dropped Kit off down the block from the station.

Defendant shared with Ray that Investigator had questioned him at work, and that he was going to move to Albia, Iowa, a town to which his parents had moved. Defendant instructed Ray not to say anything or tell law enforcement where he was located if Ray was questioned. Defendant

asked for Ray's social security card, telling Ray that "he wanted to leave the state, [and] go live under a different name." Defendant also instructed his wife Crystal to tell others that they were "headed out to Minnesota," rather than tell the truth about moving to Iowa.

In December 1998, a skull and other skeletal remains were found in Merriam Woods. A shell casing, two spent projectiles, pieces of fabric, an old shoe, a lighter, and various other items were also recovered. Dental records and DNA analysis showed that the remains were of Kit. Forensic evidence indicated that Kit had been shot in the back of the head with a small caliber weapon, consistent with a .22. A .22 caliber rifle was later recovered from Ray's home.

After the remains were found and identified, Investigator attempted to locate Defendant in Iowa to question him. Defendant was found on January 28, 1999, and Investigator questioned him in the presence of Iowa authorities. Defendant changed his story again, stating that he dropped Kit off at a pool hall in Springfield. Defendant also claimed that he had no knowledge of the shooting and murder. However, he expressed concern that his wife was lying to him regarding affairs with other men. Defendant provided similar information in another interview conducted on February 22, 1999. Ray, who had moved to Iowa as well, was also interviewed on February 22, but he was combative and provided little information at that time.

Ray attempted to tell his mother about Defendant shooting Kit on several occasions, but she cut him off before he could finish. Ray also suffered from nightmares following the murder, a fact to which his mother testified as well. Ray spoke with detectives in Missouri on August 6, 1999, and told them that Defendant shot Kit.

The detectives convinced Ray that telling the truth, even though Defendant had told him not to, would put the family at ease, and Ray felt it had been a mistake for him not to go to the authorities sooner.

A warrant was issued for Defendant's arrest, and on August 7, 1999, he was apprehended by authorities in Iowa and held at the Monroe County, Iowa jail facilities. Patricia Resczenko ("Deputy"), a deputy sheriff and chief investigator for the county, who was aware that Defendant was being held on a warrant for first degree murder, accompanied Defendant to an exercise area on that day so that he could smoke a cigarette. Deputy made conversation with Defendant by noting that he appeared to be "having a pretty rough day." Defendant responded affirmatively, noting that he had not eaten or slept well in two years. In response to Deputy's comment that, "This is quite a burden to carry," Defendant stated, "It's terrible." As the two discussed various topics, including religion, Deputy stated, "Even good people make mistakes," to which Defendant responded, "Not like this." Defendant also stated that "he didn't understand how he could do something like this, that God always came first in his life." Defendant also discussed his relationship with Crystal, telling Deputy that she had physically abused him and that he had "just snapped."

Deputy also made reference to the fact that Ray had already made a statement and told Defendant, "This must be rough on your brother." Defendant expressed that Ray was all right and that the two of them did not discuss this. Defendant also stated that he was remorseful, and that he "wasn't trying to be rude to those attorneys or those investigators when [he] asked for an attorney." Deputy's response was, "I don't think they feel that way, it's your right to have an attorney."

Deputy further commented that, "Basically they know you did it, you know you did it," to which Defendant replied, "Yeah."

On August 10, 1999, as part of her regular duties to check outgoing mail sent by prisoners for content and contraband, Kathleen Harrison, the jail supervisor in Monroe County, Iowa, logged and made copies of two letters written by Defendant. One letter was to his parents in which he wrote, "Right now I am pretty scared. Please tell every kid you see that drugs are horrible.... Tell everyone I love them.... I will do whatever it takes to show them I have something to offer this world and because of one horrible day my life will still be worth something. Please forgive me for all the pain I have caused." The second letter was addressed to a Terrie Richardson, and in it Defendant wrote, "My past has caught up to me. I know you know that I am not that kind of person. Back then the drugs ran my life for about a year. It's hard to believe that a God loving man like me could be so horrible. I hope they can forgive me."

Defendant was charged with one count of murder in the first degree, in violation of § 565.020, RSMo 2000, and one count of armed criminal action, in violation of § 571.015, RSMo 2000. Following a change of venue from Taney County to Christian County, Missouri, a jury trial was held in July 2001. Defendant testified in his own defense and claimed that Ray had shot Kit. The jury found Defendant guilty on both counts and recommended punishment of life imprisonment without eligibility for probation or parole on the first count and life imprisonment for the second count. The trial judge ordered that the sentences be served consecutively. Following the trial court's denial of Defendant's amended motion for new trial, this appeal was filed.

Defendant raises three points on appeal. In his first point, Defendant contends that the trial court abused its discretion in precluding him from presenting evidence that Ray had sold and planted marijuana. Defendant argues that such evidence was crucial with regard to showing Defendant's innocence and its exclusion violated his rights under the United States and Missouri Constitutions to present a defense, to due process, and to a fair trial. According to Defendant, the excluded evidence would have tended to establish his defense that Ray had killed Kit because Kit owed Ray money from a prior drug deal, and that Ray's bringing the rifle to the location was not surprising given that Ray was growing marijuana plants in the area.

The State filed a motion in limine requesting that the Defendant be prohibited from referring at trial to any of Ray's prior bad acts or uncharged crimes. During the discussion of that motion, Defendant argued that Ray's drug use and dealing were part of the defense theory that the shooting was related to "a drug deal that had gone bad." The State agreed that there was direct evidence concerning drug use on the day of the shooting, but questioned whether direct evidence existed of drug dealing and any connection of that to the shooting. The trial court sustained the State's motion in limine, except as to testimony by Ray concerning drug use at the time and asked that defense counsel approach the bench before the subject was broached at trial.

Before Defendant began his cross-examination of Ray, a bench conference was held in which defense counsel reiterated the defense theory that Kit died because of drugs and asked that she be allowed to ask Ray about his involvement with drugs around the time period of the shooting. The court questioned how, even if Defendant could prove that Ray was selling

drugs, that related to Kit's death and Defendant. Given that defense counsel agreed that Ray would deny killing Kit over a drug deal gone bad and would also deny involvement in drug dealing during that period of time, the court also questioned how defense counsel would impeach Ray's testimony, other than by Defendant testifying that, "I didn't shoot [Kit], my brother shot him[.]" After a lengthy discussion, the trial court determined that it would allow defense counsel to ask Ray whether he sold drugs to Kit and would reserve further ruling based on Ray's response to that question and proposed follow-up questions.

During Ray's cross-examination, the following exchange occurred:

[Defense counsel]: Now I want to talk to you a little about, you indicated that you were familiar with this area that you all went to that day?

[Ray]: Yes.

. . . .

[Defense counsel]: Now you guys used to go and smoke marijuana down there?

[Ray]: Yes.

[Defense counsel]: Did you have some plants down there?

[The State]: Objection.

The trial court sustained the objection and further discussion ensued on the appropriate line of questioning. Defense counsel argued that she should be allowed to question Ray about the plants to show that he had a gun that day because of the plants and because he had previously seen snakes in the area. The trial judge determined that questions regarding drug use that day were acceptable, but "talking about cultivating, growing, I just think that's too broad at this point."

The issue arose again when Defendant testified on his own behalf. Defense counsel asked the court if she could question

Defendant in such a manner to establish that Ray brought a gun along that day because Ray had seen snakes in the area on previous occasions when he had checked on his marijuana plants. The court agreed to allow questioning regarding Ray carrying a gun and Ray indicating he had seen snakes in the area, but no questions about marijuana plants.

Defendant was allowed to testify that he had smoked marijuana with Kit more than once and that such marijuana was obtained from Ray. He also testified that on the day Kit was shot, he and Kit had gone to Ray's house to purchase marijuana, but that Ray asked Defendant to leave when he realized Kit was in the car. Defendant testified that, per Ray's instructions, he and Kit drove to the home of Defendant's mother and met Ray there, and that the three men then went in Ray's pickup to the lake area where Ray shot Kit. During his description of the events, Defendant was allowed to testify that Ray had previously mentioned he had seen snakes in the area, but the State's objection to Defendant's statement that Ray expressed that they went to the area to check on some marijuana plants, was sustained.

A trial court has broad discretion in ruling on the admission or exclusion of evidence at trial. *State v. Robinson,* 90 S.W.3d 547, 550 (Mo.App.2002). Admissibility of evidence requires relevance. *State v. Weekley,* 92 S.W.3d 327, 332 (Mo.App.2002). Evidence is relevant when it tends to confirm or refute a fact in issue, or corroborates evidence that is relevant and pertains to the primary issue in the case. *State v. McCoy,* 69 S.W.3d 482, 484 (Mo.App.2000). Similar to rulings on admissibility, a trial court enjoys broad discretion in determining relevancy. *Id.*

Absent a clear abuse of discretion, we will not disturb the trial court's

rulings regarding relevance and the admission and exclusion of evidence. *Id.* Such abuse of discretion occurs when the trial court's evidentiary ruling is clearly against the logic of the circumstances before the court, and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful and deliberate consideration. *Robinson,* 90 S.W.3d at 550. We review such rulings for prejudice, not for mere error, and will reverse only if the error was so prejudicial that it deprived Defendant of a fair trial. *Id.* If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Weekley,* 92 S.W.3d at 333.

■ Evidence that another person had an opportunity or motive for committing the crime is not admissible without proof that the other person did some act directly connecting him or her with the crime. *State v. Davidson,* 982 S.W.2d 238, 242 (Mo. banc 1998). In addition to directly connecting that other person with the *corpus delicti,* such evidence must clearly point to someone other than the accused as the guilty person. *State v. Rousan,* 961 S.W.2d 831, 848 (Mo.banc 1998). Acts that are disconnected, remote, or outside the crime itself cannot be separately proved for such purpose. *Id.* Evidence that has no other effect than to cast a bare suspicion on another person, or to raise a conjectural inference as to the commission of the crime by another, is not admissible. *Id.*

■ Here, there were quite lengthy bench conferences in which the issue of how much of this evidence regarding Ray and his alleged past drug dealing and growing of marijuana plants would be admissible. Without question, the trial court carefully considered the relevancy and admissibility of the evidence and weighed its probative versus prejudicial value and allowed defense counsel to introduce evidence only within those bounds.

We agree with the trial court that the purported evidence was lacking in terms of showing direct evidence that Ray, rather than Defendant, killed Kit because of a drug deal gone bad. Evidence that Ray was a drug dealer or grew marijuana plants in the same woods in which Kit was shot was too disconnected or remote to clearly point to him rather than Defendant as the one who committed the crime. We find no abuse of discretion in the trial court's ruling. Point I is denied.

In Point II, Defendant contends that the trial court clearly erred in overruling his motion to suppress and allowing Deputy to testify in rebuttal concerning statements Defendant made to her at the Monroe County, Iowa jail. Defendant argues the statements used were not admissible, even for the purpose of impeachment, and were used as substantive evidence in violation of his constitutional rights to due process, privilege against self incrimination, and right to counsel. Defendant also argues in this point that the State failed to lay a proper foundation for the admission of the statements for impeachment purposes.

The statements Defendant made to Deputy while she accompanied him to smoke a cigarette at the Monroe County, Iowa jail facility were detailed earlier in this opinion. Defendant filed a motion to suppress these statements and arguments on the motion were not heard until after the trial had begun because the witness was travelling from Iowa and she had not been made available to defense counsel prior to trial.

During the presentation of Defendant's case, while Defendant was being cross-examined by the State, the following exchange occurred.

[The State]: Did you ever tell anyone that you knew they knew that you did it?

[Defendant]: I don't remember, sir.

. . . .

[The State]: That you were remorseful? Did you ever say that you were remorseful?

[Defendant]: I don't know if those were my exact words.

[The State]: But something of that nature?

[Defendant]: Very well could be.

[The State]: You were sorry that you did it?

[Defendant]: Nothing along those lines.

[The State]: That you, in fact, were a Christian and Christians don't do things like that, did you tell someone that?

[Defendant]: I don't remember who I was speaking to, sir.

[The State]: Well, but do you remember saying this?

[Defendant]: Not necessarily to an officer, sir.

[The State]: So you don't know—you don't remember telling an officer that?

[Defendant]: I don't recall.

[The State]: Do you ever remember telling an officer that you knew you did it and you knew that they knew you did it?

[Defendant]: No, sir, I don't recall.

[The State]: You told the officers that you had an abusive relationship with your wife, Crystal?

[Defendant]: Yes, sir.

[The State]: And the fact that she had abused you?

[Defendant]: On numerous occasions, yes, sir.

[The State]: And that you told them at one point that you just, because you were in this relationship you just snapped?

[Defendant]: I believe that's what ended our relationship.

[The State]: You told the officer that you just snapped?

[Defendant]: I believe those might have been my words, yes, sir.

The motion to suppress hearing was held after the defense rested its case. After Deputy testified to the statements outlined earlier and heard arguments from both sides, the trial court indicated that had the State attempted to use the evidence within its case-in-chief, the court "would have seriously considered suppressing [it]." The court then considered whether statements in violation of the Fifth and Sixth Amendments could be used in rebuttal for impeachment. The trial court overruled the motion to suppress and allowed the statements to be used for impeachment purposes. The trial court found that Defendant had not been advised of his rights, was in custody, and when he and Deputy started talking about specifics, it was a type of interrogation. The State was allowed to call Deputy as a rebuttal witness and she testified in a similar manner as during the motion to suppress hearing.

There is no question here that the statements Defendant made to Deputy were made in violation of his constitutional rights under the Fifth and Sixth Amendments. The trial court clearly stated in its ruling that the statements were not admissible, except for the limited purpose of rebuttal or impeachment.

The United States Supreme Court has spoken on the issue of the proper use of such statements, and Missouri courts have followed such precedent. Unwarned statements have been held admissible for purposes of impeachment and rebuttal of an accused's courtroom testimony if the statements were not otherwise involuntarily obtained in violation of the Fifth

Amendment. *Harris v. New York*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. Fakes*, 51 S.W.3d 24, 28 n. 3 (Mo.App.2001). "[T]he shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." *Oregon v. Hass*, 420 U.S. 714, 722, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *State v. Mitchell*, 622 S.W.2d 791, 796 (Mo.App. 1981).

 The discretion of the trial court includes the duty to determine the relevance and materiality of evidence proffered for impeachment. *State v. Jones*, 629 S.W.2d 589, 591 (Mo.App.1981). We will not disturb a trial court's ruling in that regard absent a clear abuse of that discretion. *Id.*

 There are two criteria that must be followed when using statements for purposes of rebuttal and impeachment: (1) a showing that the statements are voluntary and (2) the use of statements must rest upon the laying of a proper foundation. *Mitchell*, 622 S.W.2d at 796. To lay a proper foundation to impeach a witness with regard to a prior inconsistent statement, the witness must be provided an opportunity to refresh his or her recollection of the prior statement and then allowed to admit, deny, or explain it. *Litton v. Kornbrust*, 85 S.W.3d 110, 114 (Mo.App. 2002).

 If the witness unequivocally admits to the prior statements, further proof is unnecessary and the evidence is inadmissible because the witness, by his own admission, has impeached himself. *Id.* Therefore, it is an unequivocal admission of the prior statement that bars its use. *State v. Blockton*, 703 S.W.2d 500, 505 (Mo.App.1985). If the witness, instead, equivocates about the prior statement, it may be shown that he made the previous statement. *Id.*

 In some cases it may be readily apparent whether a witness clearly admits to the statement or clearly denies the statement. Here, Defendant's responses were mostly of the "I don't recall" nature. When a witness professes not to remember if a prior statement was made or not, that is considered equivocal, and a proper foundation has been made to admit the prior inconsistent statement. *Id.*

 As a proper foundation was laid, we find that Defendant's trial testimony was inconsistent with the statements he made to Deputy. Therefore, the trial court neither erred nor abused its discretion in overruling Defendant's motion to suppress and limiting the evidence as use for rebuttal or impeachment purposes. Defendant's second point is denied.

In Defendant's final point, he argues that the trial court erred in refusing to submit his proffered instruction patterned after MAI–CR3d 310.06, which included parenthetical language regarding Defendant's ability to understand what he was saying or doing at the time of his statements to law enforcement officials. Defendant contends that the trial court's refusal to give his version of the instruction in place of the State's version deprived him of his rights to due process and to have the jury properly instructed as guaranteed by the United States and Missouri Constitutions.

 The instruction submitted by the State and used at trial was follows:

Evidence has been introduced that the defendant made certain statements relating to the offense for which he is on trial.

If you find that a statement was made by the defendant, and that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you may give it such

weight as you believe it deserves in arriving at your verdict.

However, if you do not find and believe that the defendant made the statement, or if you do not find and believe that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you must disregard it and give it no weight in your deliberations.

The instruction submitted by Defendant, refused by the trial court, appears below with differences indicated in bold.

Evidence has been introduced that the defendant made certain statements relating to the offense for which he is on trial.

If you find that a statement was made by the defendant **and that at that time he understood what he was saying and doing,** and that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you may give it such weight as you believe it deserves in arriving at your verdict.

However, if you do not find and believe that the defendant made the statement, **or if you do not find and believe that he understood what he was saying or doing,** or if you do not find and believe that the statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement, then you must disregard it and give it no weight in your deliberations.

When considering whether a defendant was entitled to a particular instruction, we review the evidence in the light most favorable to the defendant. *State v. Anglin,* 45 S.W.3d 470, 474 (Mo. App.2001). However, before any party is entitled to an instruction, there must be evidence to support its submission, and absent that evidentiary basis, it is not error to refuse the submission of an instruction. *State v. Hall,* 779 S.W.2d 293, 295 (Mo.App.1989).

The Notes on Use to MAI–CR3d 310.06 states:

> The matter in parentheses in the second and third paragraphs should be included in the instruction if there is evidence that the defendant did not understand what he was saying or doing at the time of the statement, whether because of mental disease or defect or because of intoxication, drugged condition, or other mental incapacity, latent or induced, temporary or permanent.

*Anglin,* 45 S.W.3d at 475.

The extent of Defendant's argument here relates to his conversation with Deputy discussed at length in the analysis of Point II. During the instructions conference, defense counsel argued that "the evidence from [Deputy] indicated that [Defendant] was under a suicide watch and that in her conversation with him there was indication that he was shook up, that he was trembling, that he was in essence in a bad place to just kind of synopsize things." According to Deputy, Defendant appeared to be having "a rough day."

To defense counsel, this was evidence of some "other mental incapacity." We disagree. Defendant does not present evidence that the statements were not made voluntarily and freely and the evidence presented does not rise to the level necessary to warrant the submission of the instruction requested by Defendant. Point III is denied.

The judgment is affirmed.

RAHMEYER, C.J., and SHRUM, J., concur.