STATE of Missouri, Plaintiff–
Respondent,

v.

Larry DeCLUE, Defendant–Appellant.

No. 25524.

Missouri Court of Appeals,
Southern District,
Division One.

March 22, 2004.

Gwenda R. Robinson, Dist. Defenders Officer, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

JAMES K. PREWITT, Judge.

Following jury trial, Larry DeClue ("Defendant") was convicted of murder in the first degree, in violation of § 565.020, RSMo 1994, and sentenced to life imprisonment without eligibility for probation or parole. With three points relied on, Defendant contends that the trial court abused its discretion by excluding from evidence the videotaped statement of a co-defendant, and by limiting the cross-examination of the only alleged eyewitness to the crime and not allowing questions relating to the witness' juvenile record or the arrest of the witness' father for the crime.

## Facts

Defendant does not challenge the sufficiency of the evidence. Viewed in the light most favorable to the verdict, the following evidence was adduced at trial. Diane Coleman ("Diane") suffered from schizophrenia and lived at the Westwood Care Center ("Westwood") in Crawford County, Missouri. Diane was allowed the freedom to leave the facility, and often did so during the day, but it was her custom to return to Westwood at night.[1]

Diane's mother, Peggy Coleman, either saw or spoke with Diane by phone every day, and last spoke with Diane sometime on November 11, 1997. Diane was last seen at Westwood between 8:30 and 9:00 a.m. on November 11, as she was leaving the facility. Peggy was notified the next morning that Diane had not returned to Westwood the previous night.

Sometime after 11:30 p.m. on November 11, 1997, eleven-year-old Kenneth Paul Busse, Jr. ("Kenny"), who lived at the home of his grandmother, was visited by his sister Amanda (referred to in the transcript as Defendant's common-law wife), Defendant, Jeremy Payne, Angela Cody, and Lisa O'Brien. Amanda encouraged Kenny to go out with the group to celebrate his upcoming twelfth birthday, since she and Defendant were going to be out of town.

Although initially hesitant to go with them, Kenny did go with the group, and they left in a van owned by Kenny's father (Busse Sr.) and driven by Defendant. At some point, Amanda gave Kenny a strip of the drug LSD; he put it in his mouth for only a couple of seconds.

Kenny fell asleep and when he awoke, he was alone in the van. He exited the van and saw "[e]verybody in the road." Diane was also lying "in the road." As Kenny attempted to get his sister to tell him what was happening, Defendant went to the van and returned with a pipe cutter, crowbar, and souvenir baseball bat.

Defendant informed the group that "everybody had to hit [Diane] .... [s]o there would be no snitches." The objects Defendant had retrieved from the van were passed around the group and they all took turns hitting Diane, all except Kenny who ran back to the van. As she was being struck with the objects, Diane attempted to speak, but it sounded gargled. Diane also raised her arms in front of her face to protect herself from being hit.

Once in the van, Kenny looked out and saw Defendant and Jeremy carry Diane's body to the bridge and toss it over the side of the bridge. Diane's foot became stuck in a branch and as Defendant was trying to untangle it, a car pulled up and an occupant asked if she could help with anything, at which time Jeremy pretended to vomit and Amanda told the person in the

1. For simplicity's sake, we will refer to Diane Coleman and others in the case by their first names. We mean no disrespect.

car that Jeremy had too much to drink and was ill. The group then came back to the van and Defendant told them, "if anybody said anything, ... he would take care of it."

The next day, Defendant and Jeremy picked up Kenny at Kenny's grandmother's home and the three went back to the bridge, retrieved Diane's body, and placed the body, covered by a tarp, in the back of Defendant's pickup truck. Once they arrived at Defendant's property on Sappington Bridge Road, Defendant told Kenny to wait there, and Defendant and Jeremy left in the truck and went into the woods. When Defendant returned, Jeremy was no longer with him, but Kenny's uncle, Ron Gray, was.

Defendant instructed Kenny to retrieve buckets and rags, and Kenny watched Defendant and Ron burn the liner from the truck and wash the truck with soap, water, and bleach. After they finished cleaning the truck, they took Kenny back to his grandmother's house.

Deer hunters discovered Diane's body on November 15, 1997, in the Meramec River. She had received multiple blows from a blunt object or objects, and the injuries from the blows, which included a laceration at the base of the brain stem that separated the brain from the spinal cord, caused her death. Diane also had numerous injuries consistent with self-defense-type wounds, which indicated she attempted to protect herself.

A day or so after the murder, Defendant and Jeremy went to the home of Robert Cline. Amanda was also there, but she stayed in the vehicle. Defendant told Robert that they had seen a woman's body in a ditch near Highway N. Robert did not see Defendant again until May or June of 1998, at which time Defendant "just started talking about the murder." Defendant told Robert that he had "bashed [Diane] in

the head with a hammer and put her out of her misery."

A month or so later, Defendant had another conversation with Robert in which Defendant talked about cutting the bed liner out of the truck. Defendant also commented to Robert about being "up for murder." Defendant further told Robert how "he would like to take a garden hose and stuck [sic] it up that fat bitch and turned [sic] it on to see how much it would take to blow her up."

Defendant's half-brother, William De-Clue, asked Defendant in October of 1998, whether Defendant was connected to Diane's murder. Defendant told William that he was not involved. In January, 2000, William asked Defendant again about his involvement, and Defendant was more forthcoming. Defendant told William that they had initially accidentally hit Diane, and then became scared. According to Defendant, they "pulled her back in the weeds, ... [hit her], and then ... raped her while she was dying."

Patrick Livell met Defendant through J.R. Gilliam almost a year after the murder. While Defendant talked with J.R., Patrick heard Defendant brag about killing Diane, sticking objects such as sticks into her vagina, and beating her. In a letter to Robert Cline, Defendant told Robert that he would "take care of [J.R.] like [Diane] and they won't find [J.R.] in no river."

After Defendant was arrested for murder in May of 2000, he had a conversation with Danny Hayworth, a fellow inmate in the Miller County jail. During this conversation, Defendant admitted that he had participated in the kidnapping and murder of Diane, and that he had "hit her over the forehead with a tire tool[.]"

Following a change of venue from Crawford County to Pulaski County, Defen-

dant's jury trial was held in February, 2003. The jury found Defendant guilty of murder in the first degree, in violation of § 565.020, RSMo 1994, and sentenced him to life imprisonment without the possibility of probation or parole. Defendant filed a motion for new trial, which was denied. This appeal followed.

## Discussion

Defendant raises three points on appeal. Additional facts necessary to the disposition of the case are included below as we address each of those points.

*Point I: Exclusion of Jeremy's videotaped statement*

Defendant argues in his first point that the trial court erred and abused its discretion by excluding from evidence the videotaped statement of Jeremy Payne, who was tried separately for Diane's murder. Defendant contends that his constitutional rights to due process, present a defense, and a fair trial were violated. According to Defendant, had the trial court admitted Jeremy's videotaped statement, there is a reasonable probability that the jurors would have found Jeremy's confession determinative of Defendant's guilt and would have given credence to the confession of an adult eyewitness over the testimony of an alleged teenage eyewitness (Kenny) who implicated Defendant in the crime, but had recanted such statements on more than one occasion before trial.

Jeremy made a videotaped statement to Crawford County law enforcement officials on November 21, 1997. Within the videotape, Jeremy described the murder, and indicated that those present included Busse Sr., Melissa O'Brien, and Angela Cody. Defendant is correct that at no time in the statement does Jeremy mention whether Defendant was present during the murder.

In the State's motion in limine requesting that the trial court prohibit the use of Jeremy's videotaped statement, it argued that, although the statement was admissible as an admission against interest with respect to Jeremy, it was not admissible at Defendant's trial, because it was inadmissible hearsay, and there was no exception to the rule to allow its admission. Defendant's counsel argued that the statement met the necessary test, which will be more fully described below, to allow its admission at Defendant's trial.

After the State rested its case, Defendant's counsel made an offer of proof regarding the admission of Exhibit G, Jeremy's videotaped statement. The trial court ruled that the evidence was inadmissible. The exclusion of the videotaped statement was one of Defendant's allegations of error in the motion for new trial.

▉ The trial court has broad discretion in ruling on the admission or exclusion of evidence at trial. *State v. Wilson,* 105 S.W.3d 576, 582 (Mo.App.2003). Absent a clear abuse of discretion, we will not disturb the trial court's ruling regarding the admission or exclusion of evidence. *Id.*

▉ In matters involving the admission or exclusion of evidence, this Court reviews for prejudice and will reverse only if the error was so prejudicial that it deprived Defendant of a fair trial. *State v. Richardson,* 923 S.W.2d 301, 311 (Mo.banc 1996). Trial error does not require reversal unless there is a reasonable probability that the error affected the outcome of the trial. *State v. Barriner,* 111 S.W.3d 396, 401 (Mo.banc 2003).

▉ There is no dispute here that Jeremy's videotaped statement contained statements against penal interest. Such statements, although admissible under the Federal Rules of Evidence, and in other states under an exception to the hearsay

rule, are not admissible in criminal proceedings in Missouri. *State v. Robinson,* 90 S.W.3d 547, 551 (Mo.App.2002). They may be admissible, however, under limited circumstances where due process rights are implicated and where the circumstances strongly indicate the reliability of the statements. *Id.*

 This limited exception to the general rule is applicable if the declarant is shown to be unavailable as a witness, there are considerable assurances of the statement's reliability, and the statement, if true, would exonerate the defendant. *State v. Davidson,* 982 S.W.2d 238, 242 (Mo.banc 1998). There are three indicators of reliability, set out by the United States Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). For a statement to meet the test of reliability, it must: (1) be self-incriminatory and unquestionably against interest; (2) have been made spontaneously to a close acquaintance shortly after the crime occurred; and, (3) be corroborated by other evidence. *State v. Guinn,* 58 S.W.3d 538, 545 (Mo.App.2001).

 Assuming without deciding that, here, Jeremy (as declarant) was unavailable as a witness and that the statements contained in Jeremy's videotaped statement would exonerate Defendant, the statements do not meet the reliability test. Within that three-step test, Defendant failed to show that Jeremy's statements were made to a close acquaintance shortly after the crime. Although the videotaped statement was made ten days after the crime, the "close acquaintance" prong requires that the statements be made to someone with whom the declarant has a long-standing and confidential relationship. *Robinson,* 90 S.W.3d at 554. A statement made to someone who fits that relationship

description is more likely to be trustworthy. *Id.*

As Jeremy's statements were made to law enforcement officials, the reliability test cannot be met, and therefore, not all of the criteria can be met to allow admission of the videotaped statement under the limited exception. Point I is denied.

*Point II—Exclusion of Kenny's juvenile record*

 In Point II, Defendant argues that the trial court erred and abused its discretion by limiting the cross-examination of Kenny so as to prohibit questions regarding the specifics of Kenny's juvenile record, his juvenile offense, and the juvenile proceedings. According to Defendant, he was prohibited from eliciting facts from Kenny that he lied to the juvenile court judge and that Kenny had motive to lie in this trial out of retaliation for Defendant kicking Kenny out of Defendant's home for molesting Defendant's niece.

The State argues that this point is not preserved for review because the point relied on goes beyond the scope of the allegation raised in the motion for new trial and mischaracterizes the limitation the trial court placed on Kenny's cross-examination.

In his motion for new trial, Defendant's allegation states, "The [t]rial [c]ourt erred in excluding from evidence [Kenny's] juvenile record during cross-examination of [Kenny]." During the trial, the State objected when Defendant's counsel began asking Kenny about living with Defendant and Amanda, and then about the granddaughter of Defendant's sister. During the discussion that followed, Defendant's counsel argued that it was appropriate for him to inquire about the specifics of Kenny's juvenile record, in which Kenny had admitted molesting this four-year-old child (the granddaughter of Defendant's sister, also referred to as Defendant's niece) and

also lying to the judge who presided over the juvenile case regarding the commission of the act.

During the bench conference, the trial court initially indicated that defense counsel could not inquire about Kenny's lying to the judge who presided over the juvenile case. With regard to the specifics of the juvenile offense, the trial judge noted that he had "no problem with [defense counsel] getting into the fact that [Kenny] was involved in a incident that involved [Defendant's] relative and [Defendant] was angry with [Kenny] and threw him out." As for Kenny's propensity to lie and the need to include testimony that Kenny lied to the judge who presided over the juvenile case, the trial judge stated, "[Kenny] has already told this jury that he's lied."

As the bench conference proceeded, this exchange occurred:

[Defense]: So let me understand. I cannot inquire into the specific facts of the molestation of the child; is that correct?

[Trial court]: That's correct.

[Defense]: I cannot inquire into whether [Kenny] was charged and eventually had a disposition in Juvenile Court around the time of his statements; is that correct?

[Trial court]: I think you can get to the real point, which is the fact that [Kenny] did an act to a relative of [Defendant] that made [Defendant] angry enough to throw [Kenny] out of the house—

[Defense]: I understand, Judge—

[Trial court]:—and that he pled guilty and lied to the Judge in doing that plea—

[Defense]: Without mentioning—

[Trial court]:—without getting into the juvenile act.

[The State]: Or the facts.

[Trial court]: Or the facts of the case.

[Defense]: Okay. So the Court is going to prohibit me from mentioning that he had a Petition filed against him in Juvenile Court, and that there was any adjudication up against him in Juvenile Court at a time when he was being questioned regarding [Defendant's] involvement in this murder. Is that the courts's [sic] ruling?

[Trial court]: you can ask him—I think you can do that very easily without saying anything about Juvenile Court. Were you charged with this crime? Yes. When was that? Whenever it was, and I think you can do all of those things that you're trying to do here without saying anything about Juvenile Court or the fact that it was a sexual case.

. . . .

[The State]: Am I understanding the Court is ruling that they can ask him if he lied to a Judge in a previous proceeding, they can ask him if [Defendant] got angry with him because of some—a matter within the family and kicked him out of the home? Is that—

[Trial court]: I think [defense counsel] can ask him an incident involving, whatever this lady's name is, which is his name.

[Defense]: I'm not going to mention her name, Judge.

[Trial court]: Okay. I see no reason why you have to get into—you don't have to get into the fact that it was a juvenile case.

. . . .

[Trial court]: I think that gets you where you're trying to be. It's not as inflammatory as what you were trying to do.

Defense counsel made an offer of proof, after which the trial court indicated it was making the "[s]ame ruling." Defense

counsel then proceeded with the cross-examination of Kenny, in the presence of the jury, and questioned Kenny about being charged with, and eventually pleading guilty to, an incident involving the child, and that Defendant kicked Kenny out of his home once Defendant learned of the incident. Defense counsel also received an affirmative response from Kenny as to whether it was soon after that incident that Kenny made his first statement to the police, in March of 2000, implicating Defendant in the murder.

Kenny was also questioned about later statements he made to the police, and his admission that he had taken one hit of acid on the night of the murder and that, "we were all pretty messed up." At the beginning of his cross-examination, Kenny admitted that he had lied, including in statements to police officers in this case and when he had been under oath at preliminary proceedings related to the case.

■ The trial court is vested with broad discretion in the admission or exclusion of evidence. *State v. Seiter*, 949 S.W.2d 218, 222–23 (Mo.App.1997). This discretion includes the duty to determine the relevance, materiality, and remoteness of the proffered impeachment evidence. *State v. Gee*, 822 S.W.2d 892, 895 (Mo.App. 1991). We will not disturb the trial court's ruling on appeal absent a clear abuse of its discretion. *Seiter*, 949 S.W.2d at 223. We review for prejudice and not mere error; thus, we will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial. *State v. Charlton*, 114 S.W.3d 378, 383 (Mo.App.2003).

Here, giving Defendant the benefit of the doubt regarding the preservation of this point, we find no prejudice occurred. Kenny admitted lying on various occasions. Whether the trial court's ruling allowed defense counsel to inquire about Kenny's lying to the judge in the juvenile proceedings may be arguable; however, we find that such questions and Kenny's affirmative answers to them would not have added to the impeachment of Kenny as a witness. Defense counsel was allowed to ask and did ask Kenny about the proximity of his first statement implicating Defendant to the incident involving Defendant's niece, an incident for which Kenny was charged and pled guilty, as well as an incident for which Kenny was kicked out of Defendant's home. Kenny's motivation to lie was squarely before the jury for its consideration.

Point II is denied.

*Point III—Limiting of Kenny's cross-examination testimony regarding Busse Sr.'s arrest*

■ In his third point, Defendant argues that the trial court erred and abused its discretion by limiting the cross-examination of Kenny and sustaining the State's objection to questioning of Kenny about his father's (Busse Sr.'s) arrest in connection with Diane's murder. According to Defendant, such limitation denied him his constitutional rights to confrontation and cross-examination, to present a defense, to due process of law, and to a fair trial. Defendant contends that, without such testimony, the jury was left with insufficient evidence from which to assess Kenny's credibility.

Similar to Point II, the State argues here that this point has not been properly preserved for review, as there was no offer of proof at trial.

During the cross-examination of Kenny, defense counsel asked Kenny about a letter he wrote following testimony he gave under oath in September of 2000. The letter, which was admitted into evidence and read to the jury, stated as follows:

I, Kenneth Paul Busse, the statement I made about the murder was and is

completely untrue. The reason I lied was because I wanted to clear my father's name. The night it happened, I was at my grandmother's house playing Nintendo with my brother, Timothy Earl Busse. I don't know if my father was involved or not, but I know it was not something to be lying about. I could have gotten into a lot of trouble, and I very well still may, but if I do, I will be ready to face the consequences. I'm sorry I lied about it, but the only thing I was worried about was my father, and would you please tell my sister I'm sorry for getting her locked up.

After the letter was read in open court, defense counsel asked Kenny, "You know your father was originally charged and arrested for the crime?" Before Kenny could answer, the State objected, and its objection was sustained. There was no offer of proof, although in his motion for new trial, one of Defendant's allegations of error was that the trial court had "erred in excluding from evidence the fact that [Busse Sr.], father of witness [Kenny], had been charged and incarcerated for the murder of Diane Coleman."

■■■ "When an objection to proffered evidence is sustained, the proponent of the evidence must make an offer of proof in order to preserve the matter for appellate review." *State v. Schneider*, 736 S.W.2d 392, 401 (Mo.banc 1987). The offer of proof must show what evidence will be given if the witness is allowed to testify, the purpose and object of such testimony, and all facts necessary to establish its admissibility, including the relevance and materiality of the evidence. *State v. Nettles*, 10 S.W.3d 521, 528 (Mo.App.1999).

Even if we assume here that we can glean from the record the necessary information that likely would have been presented in an offer of proof, specifically that Kenny was aware of his father's arrest for

the crime, we can find no prejudice, much less the manifest injustice required for plain error.

■■■ Assuming the error was properly preserved, the trial court has broad discretion in determining the permissible scope of cross-examination. *State v. Mayes*, 63 S.W.3d 615, 629 (Mo.banc 2001). Cross-examination is used to test the accuracy, veracity, and credibility of a witness, and therefore, cross-examination is not necessarily limited to those issues that tend to prove the issues at trial. *State v. Gardner*, 8 S.W.3d 66, 72 (Mo.banc 1999). However, trial judges are permitted wide latitude to impose reasonable limits on cross-examination to address concerns of prejudice, confusion of the issues, and questioning that is only marginally relevant. *State v. Mann*, 23 S.W.3d 824, 835 (Mo.App.2000).

■■■ A defendant has the right to cross-examine his accusers, but that right is not without limitation. *Guinn*, 58 S.W.3d at 547. The opportunity for effective cross-examination does not necessarily include "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (internal quotations and citations omitted). As with Point II, if we assume the allegation of error was properly preserved, we review for prejudice and not mere error; and will affirm the trial court's ruling unless it was so prejudicial as to deprive Defendant of a fair trial. *Charlton*, 114 S.W.3d at 383.

■■■ The December, 2000 letter was admitted into evidence during Kenny's cross-examination. Within the letter, Kenny declared, "The statement I made about the murder was and is completely untrue. The reason I lied is because I wanted to clear my father's name." That testimony, along with the testimony outlined in Point II in which Kenny admitted lying in his

various statements to law enforcement officials throughout the investigation of this case, we find that there was ample testimony before the jury regarding Kenny's contradictory or inconsistent statements to allow the jury to determine Kenny's credibility. A defendant's right to confrontation is not impinged if the defendant has the opportunity to cross-examine and elicit testimony on matters such as a witness' bias. *State v. Dixon*, 922 S.W.2d 75, 77 (Mo.App.1996).

Point III is denied.

## Conclusion

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.